### BARTHOLOMEY v. STATE OF MARYLAND

[No. 106, September Term, 1970.]

*Decided February 2, 1971.*

506

pp. 533-536

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SMITH, JJ.

*James F. Garrity* for appellant.

*T. Joseph Touhey, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, John C. Hancock, State's Attorney for Charles County, Louis P. Jenkins, Assistant State's Attorney for Charles County, Alfred T. Truitt, Jr., State's Attorney for Wicomico County,* and *Richard M. Pollitt, Assistant State's Attorney for Wicomico County,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, Joseph James Bartholomey, was indicted by the Grand Jury for Wicomico County in several indictments, four of which were removed from the Circuit Court for Wicomico County to the Circuit Court for Charles County for trial. In the latter court these four indictments for the crimes indicated received the following numbers: No. 3278 charging escape from the Wicomico County Jail; No. 3282 charging assault with intent to murder Ralph Pusey; No. 3284 charging murder of Albert Kelly; and, No. 3285 charging murder of Samuel A. Graham. The jury found the appellant to have been sane on December 8, 1968, the time of the commission of the crimes charged and guilty in all four cases. The lower court (Digges, C. J.) sentenced the appellant in No. 3278 to a term of imprisonment of 10 years to begin at the conclusion of the sentences imposed in Nos. 3284 and 3285; in No. 3282 to a term of 10 years to run concurrently with the sentence imposed in No. 3278 and to begin at the conclusion of the sentences imposed in Nos. 3284 and 3285; and in each of cases Nos. 3284 and 3285, the appellant was sentenced to death by the administration of lethal gas. The appellant filed timely appeals from these judgments and sentences which, pursuant to Code (1970 Cumulative Supp.), Art. 5, § 5A, came to us rather than to the Court of Special Appeals inasmuch as they involve a death sentence.

All of the crimes charged arose out of events occurring on the evening of December 8, 1968, at the Wicomico County Jail. This jail is situated on the top floor of the Court House in Salisbury, Maryland. On that evening at approximately 10:00 P.M. the appellant, who was detained at the Wicomico County Jail on warrants charging him with assault and robbery, escaped from the jail in the course of which he shot and killed Sheriff Samuel A. Graham and Deputy Sheriff Albert Kelly. He also shot at Ralph L. Pusey, who was present at the jail to talk to Sheriff Graham about being deputized as Deputy Sheriff, but fortunately the bullet did not hit Mr. Pusey.

508

As its first witness at the trial, the State offered the testimony of Peter Boolukas, M.D., a qualified pathologist at the Peninsula General Hospital in Salisbury. Dr. Boolukas testified that he performed an autopsy on the bodies of Sheriff Graham and Deputy Sheriff Kelly on December 9, 1968. He testified that Albert Kelly died as a result of a gunshot wound in the skull and in addition to this wound, the victim had a gunshot wound in his left chest. He further stated that Samuel Graham died as a result of a gunshot wound in the left chest. Two bullets were recovered from the body of Albert Kelly and four bullets were recovered from the body of Sheriff Graham. All six bullets were delivered to the Maryland State Police ballistics experts for their analysis.

The State next offered evidence through John Walston, Chief Deputy Sheriff for Wicomico County, that he was in charge of the Wicomico County Jail on December 8, 1968, and that the appellant Bartholomey was being held at that jail on that date upon warrants charging the appellant with assault, receiving stolen goods, grand larceny, and breaking and entering. These warrants were duly admitted into evidence as exhibits for the State.

Donald Leon Dashiell, an inmate in the Wicomico County Jail on December 8, 1968, as a result of a 30-day sentence resulting from a conviction for assault, testified that at approximately 9:30 P.M. on that date he was sitting at a desk with Deputy Sheriff Kelly in an area adjacent to the cell block in which the appellant was confined in Cell No. 1. At that time, Deputy Sheriff Kelly approached Cell No. 1 with the intention of locking up the prisoner for the evening when Dashiell saw the appellant with a gun. Dashiell ran to the living quarters of Sheriff Graham which are located in an apartment adjacent to the jail. At the direction of Deputy Sheriff Kelly, Dashiell closed the cell block door prior to seeking assistance from the sheriff. After telling Sheriff Graham that the appellant was attempting to escape and that Deputy Sheriff Kelly was in the cell block, Sheriff Graham told Dashiell to get help, whereupon Dashiell entered the ele-

vator adjacent to the cell block area in an effort to obtain help. As he entered the elevator, he heard shots. He then observed Deputy Sheriff Kelly fall to the floor and Sheriff Graham standing in a corner by the cell door as the door of the elevator closed. Dashiell then testified that he heard additional shots from the area of the cell block as he travelled on the elevator from the third floor to the basement of the Court House. Dashiell also stated that at the time he saw the appellant with a pistol, he was standing some seven feet from the appellant and Deputy Sheriff Kelly.

The next witness for the State, Ralph A. Harmon, who was confined in the juvenile section of the jail on December 8, 1968, testified that there was some firing and that Kelly fell across the doorsill and Graham fell back up against the wall after which he saw the appellant emerge from Cell No. 1 with a pistol in his hand. Harmon testified that he saw no other prisoners in the hallway adjacent to Cell No. 1 at the time of the shooting.

Ralph L. Pusey next testified for the State. He was in Sheriff Graham's living quarters on December 8, 1968, discussing with the sheriff about being deputized as Deputy Sheriff. After drinking some coffee, he talked with Deputy Sheriff Kelly and then went down to the trusty's cell. He heard a gunshot, then another shot. When he stepped out into the hallway, he saw Deputy Sheriff Kelly lying on the floor and Sheriff Graham lying against the door. He started to run whereupon the appellant stepped from around the corner and fired an errant shot at Pusey which hit the elevator door. Pusey then ran into the elevator and closed the door to prevent the appellant's escape. Pusey stated that the weapon he observed in the appellant's possession was a .22 caliber pistol.

Vincent D. Horsey was an inmate on December 8, 1968, in the same juvenile cell as that occupied by Ralph Harmon. Horsey testified that he heard the appellant tell Deputy Sheriff Kelly to "Open the door" and threaten to kill him. Horsey subsequently saw the appellant reach around the door and fire his gun; he heard approximately six

shots fired from a .22 caliber pistol which he had observed in the appellant's possession.

Detective Sergeant Robert D. Weir of the Maryland State Police testified that based on information obtained from David Hudson, a friend of Bartholomey, he notified the Delaware State Police that the appellant was an occupant of a motel on Route 13, Dover, Delaware. He notified the Delaware State Police on December 9, 1968, that the appellant was at the motel under the assumed name of John Davis.

Officer Irving Little of the Delaware State Police testified for the State that he was a member of the team of police officers who surrounded the Capital City Motel in Dover, Delaware and apprehended the appellant there on December 9, 1968. A .22 caliber pistol was recovered from the room occupied by the appellant, the pistol having been placed in an air conditioner in the room.

The six bullets removed from the bodies of the victims had been taken to the Maryland State Police Headquarters at Pikesville, Maryland for analysis by the ballistics expert, Russell M. Wilhelm. Mr. Wilhelm testified that the .22 caliber pistol recovered from the motel room in Dover was the gun which fired the bullets which killed Sheriff Graham and Deputy Sheriff Kelly.

At the conclusion of the State's case, the appellant moved for a judgment of acquittal which was denied by the trial court.

The appellant then produced nine witnesses, three medical experts, and six lay witnesses. The six lay witnesses, his mother, his father's second wife, his sister, a former girl friend, his aunt and a guard at the Maryland Penitentiary testified in regard to the appellant's erratic behavior during his early youth and his attempts to commit suicide.

The three medical experts testified in regard to their opinion relative to the appellant's mental condition on December 8, 1968. Dr. Norman H. Bradford was of the opinion that on that date the appellant was a paranoid psychotic; Dr. Stephen H. Kaufman was of the opinion

that the appellant was suffering from a mental disease on that date which he characterized as paranoid schizophrenia which resulted in the appellant's lack of capacity to appreciate the criminality of his act and to conform his conduct to the requirements of the law; Dr. Stanislav Groff also was of the opinion that on that date the appellant was a paranoid schizophrenic who lacked substantial capacity either to appreciate the criminality of his acts or to conform his conduct to the requirements of the law. All three medical experts testified to the extent of their examination of the appellant and the criteria they used in reaching their respective opinions.

The appellant, himself, testified on his own behalf. He stated that he believed that all police officers, judges and people working for the State were Communists who were conspiring to kill him. He testified that the Communists and Chinese were plotting to take over the world and that he had heard voices directing him to resist the plot and, in effect, to kill the aggressors. After reading a prepared speech to the jury, the appellant, on cross-examination, testified:

> "Q. Were you also instructed to eliminate Samuel Graham and Albert Kelly? A. I am instructed to eliminate all Communist agents.
>
> "Q. Well, did you eliminate Samuel Graham and Kelly? A. Yes, I did. I eliminated him thoroughly."

At the conclusion of the appellant's case in the lower court, the State produced two medical experts in rebuttal.

Dr. Robert H. Sauer, a psychiatrist and former staff member of the Clifton T. Perkins State Hospital (Perkins), who had participated in a staff conference for an evaluation of the appellant, testified that in his opinion the appellant was an "antisocial personality with drug dependence" but that in his opinion the appellant was not on December 8, 1968, suffering from a mental disease or defect of such severity that he lacked substantial capacity to appreciate the criminality of his conduct or to con-

form his conduct to the requirements of the law. After cross-examination by counsel for the appellant, the records of Perkins in regard to the appellant's psychiatric evaluation were received into evidence.

The final witness in rebuttal was Dr. Herman Riener, a psychiatrist and the clinical director at Perkins, who testified that he was the chairman of the staff conference which evaluated the appellant on March 26, 1969. He was also of the opinion that the appellant on December 8, 1968, did not suffer from a mental disease or defect of such severity as to cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. On cross-examination Dr. Riener acknowledged that he did not have the Maryland State Police reports in his possession when the Perkins staff evaluation was made. He further testified that in his opinion the appellant had a tendency to malinger mental disease, despite the fact that he concurred in Dr. Sauer's diagnosis.

At the conclusion of the entire case, the appellant again moved for a judgment of acquittal. Upon this being denied, the issue of the sanity of the appellant at the time the offenses were perpetrated as alleged in the indictments as well as the appellant's guilt or innocence, was submitted to the jury in a comprehensive and careful charge to the jury, about which we will comment more fully later in this opinion.

After the arguments of counsel, the jury deliberated and on October 8, 1969, found the appellant to be sane when the offenses occurred and guilty on the four indictments as above set forth. The jury was polled on each finding.

The trial court did not immediately pass sentence but ordered that a pre-sentence report be made. A motion for a new trial filed on behalf of the appellant was argued on October 29, 1969, and was denied by the lower court on that day.

The judgments and sentences already set forth were imposed by the lower court on December 30, 1969.

The appellant presented seven arguments to us in his brief and at argument. These are:

1. The imposition of the death penalty in these cases is unconstitutional as violative of the Eighth Amendment of the Constitution of the United States.

2. The appellant was never identified as the perpetrator of any of the crimes by the State.

3. The Maryland single verdict procedure violated the privilege of the appellant against self-incrimination.

4. The trial court erred in instructing the State's Attorney as to how to frame questions to enable the State's expert testimony to be heard.

5. The appellant was not represented by counsel at an extradition hearing in Delaware — a critical stage in the prosecution.

6. The rebuttal testimony of the State in regard to the sanity of the appellant was insufficient.

7. The trial court erred in not instructing the jury as the appellant requested.

Questions 1, 3, and 5 do not appear to have been raised below and *ordinarily* we will not consider such questions on appeal pursuant to Maryland Rule 885. This, however, is a case involving the death penalty and we have decided to consider and determine all of the questions briefed and argued by the appellant before us whether or not tried and decided by the lower court.

The appellant by a letter dated December 15, 1970, and received by the Clerk of the Court on December 16 after argument of the case on December 15, indicated dissatisfaction with his counsel in the case and that the appellant had several points in regard to inadequate representation. At our direction, the appellant was advised by a letter from the Clerk to him dated December 16 that the case had been argued before us the preceding day but that the appellant was given 20 days in which to file any

additional material, including the points stated in his letter of December 15 which must be filed on or before January 5, 1971. The appellant filed his additional five points on December 28, 1970. They are all directed at the alleged incompetence of James F. Garrity, Esquire, court-appointed counsel for the appellant and state in effect (1) that his counsel had never handled a capital case before; (2) had only visited the appellant five times before the trial so that there was insufficient opportunity to discuss some important issues with counsel in addition to the fact that he was in maximum security with a guard present and could not speak openly to his counsel; (3) that his counsel would not call certain witnesses to the stand when the appellant requested it, and failed to summon one witness which counsel said he had summoned; (4) that his counsel admitted at sentencing that he probably did not represent the appellant as best he could; and, (5) that the appellant was almost executed because his counsel thought there was an automatic appeal and stay of execution pending such appeal; the Governor, however, stayed the execution in time to prevent its being carried out. The appellant requests that his counsel be found incompetent and that a new trial be granted. The record shows that Judge Digges, on February 13, 1970, revoked his warrant of December 30, 1969, fixing the week of February 15, 1970, as the time for the execution of the death sentence. There is nothing in the record to indicate a stay by the Governor.

1.

The appellant earnestly contends that the imposition of the death penalty in these criminal cases is unconstitutional as being violative of the Eighth Amendment to the Constitution of the United States which provides that "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis supplied.)

In the Constitution of Maryland there are similar provisions. In Article 16 of the Declaration of Rights it is provided:

"That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no law to inflict cruel and unusual pain and penalties ought to be made in any case, or at any time, hereafter."

Article 25 of the Declaration of Rights provides:

"That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."

Except for the addition of the last five words "by the Courts of Law," which were really superfluous, the language of Article 25 is identical to the language of the Act of Parliament of 1689, 1 W. & M., Chap. 2. These provisions of the present Maryland Constitution of 1867 were part of the Declaration of Rights in the original Maryland Constitution of 1776 and have been continued intact in all subsequent Maryland Constitutions.

We, and our predecessors, have construed Articles 16 and 25 of the Declaration of Rights. Inasmuch as the Articles do not define "unusual pains and penalties" and "cruel and unusual punishments," it is "the province of the Legislature to fix the penalty for the commission of crimes and offenses...." *Kirschgessner v. State,* 174 Md. 195, 198, 198 A. 271, 272 (1938). In *Delnegro v. State,* 198 Md. 80, 88, 89, 81 A. 2d 241, 245 (1951), our predecessors construed the words: "cruel and unusual punishment," as follows:

"The term 'cruel and unusual punishment' has usually been understood to mean barbarous punishment by torture. In commenting on Article 25 of our Declaration of Rights, Judge Bryan said: 'This article is copied almost word for word from Statute I, W. & M., Chapter 2, which was passed immediately after the expulsion of the Stuarts. * * * History informs us that it was intended by the supreme legislative power as a solemn condemnation of the arbitrary and

oppressive proceedings which had taken place in the Courts during the preceding reigns.' *Mitchell v. State,* 82 Md. 527, 532, 533, 34 A. 246, 247."

In *Foote v. State,* 59 Md. 264 (1883), this Court held that the punishment of whipping for wife beating was not a "cruel and unusual punishment." Judge Stone, for the Court, aptly stated:

> "The eighth amendment to the Constitution of the United States is not a restraint upon, and does not apply to, the Legislature of a State, but only to the National Legislature, and, therefore, has no application to this case. *Pervear v. Commonw.* 5 Wall. 479."
>
> * * *
>
> "We are not dealing with the expediency, justice, or efficacy of this punishment, but only with the true interpretation of the terms of the Constitution under which we live. When, therefore, we find that the people who made this Constitution, and who must be presumed to understand the meaning of the terms they use, have, from the time these words were first incorporated, in 1776 down to 1882, a period of more than a hundred years, through the several successive Legislatures, uniformly held that the punishment of whipping was not included in that class which the Constitution forbids, we should violate the plainest principles of the construction of statutes now to decide otherwise. We have not only the contemporaneous, but the continued, exposition of the meaning of the words in this long course of legislative construction, upheld and continually enforced by the courts, in the imposition of the punishment."
>
> * * *
>
> "For the prevention of crime, which is the true end of all punishment, the law-giver may prop-

erly consider the frequent and easy opportuni-
ties of committing the crime and the difficulty
of guarding against it, and may grade his pun-
ishment accordingly."
(59 Md. at pages 267, 268 and 269.)

The death penalty has been held by this Court not to
be a "cruel and unusual" punishment. In *Dutton v. State,*
123 Md. 373, 91 A. 417 (1914), this Court indicated that
the imposition of the death penalty as permitted by the
applicable Maryland statute upon conviction for an at-
tempt at rape—then a misdemeanor in Maryland—was
not a "cruel and unusual" punishment, the sentence be-
ing within the statutory limits provided by the General
Assembly. Chief Judge Boyd, for the Court, stated:

> "It would hardly be contended that the pun-
> ishment provided by our statute for the crime
> of rape—death or confinement in the peniten-
> tiary for not less than eighteen months, or more
> than twenty-one years—is in conflict with those
> provisions, and when the Legislature changed
> the penalty, for an attempt to commit the crime,
> to death or confinement in the penitentiary, in
> the discretion of the Court, it is probable that
> it took into consideration, the fact that it is often
> difficult to prove whether the crime of rape was
> actually consummated. Under some circum-
> stances the outrage upon the particular woman
> and upon society can scarcely be said to be less
> because the prisoner did not succeed in accom-
> plishing his purpose than if he had. If a revolt-
> ing crime of this nature is so frequently re-
> peated as in the judgment of the Legislature to
> call for such punishment, we cannot declare it
> to be contrary to such provisions of the consti-
> tution."
> (123 Md. at 385, 91 A. at 422.)

In *Dutton* it was again pointed out that the Eighth
Amendment to the Federal Constitution did not apply to

the States. *Dutton* was followed in *Walker v. State,* 186 Md. 440, 47 A. 2d 47 (1946) and was recently cited by us with approval in *Jones v. State,* 247 Md. 530, 233 A. 2d 791 (1967).

In *Mitchell v. State,* 82 Md. 527, 34 A. 246 (1896), this Court, by *dictum,* indicated that in cases in which the trial judge had the power to impose sentence without definite limit, it was possible to violate the Constitutional provision prohibiting cruel and unusual punishment, but no such case appears to have ever occurred in Maryland. In *Jones, supra,* Chief Judge Hammond, for the Court in sustaining the imposition of a sentence of death in a rape case, summarized the applicable Maryland law as follows:

> "Imposition of the penalty of death for rape does not violate the proscription of Article 16 of the Declaration of Rights of the Constitution of Maryland against cruel and unusual punishment. *Dutton v. State,* 123 Md. 373, 385, 91 A. 417. Almost always the matter of sentence in Maryland is within the province of the trial judge, and his choice, if it is within the limits of the law, will not be changed on appeal. The law on the point was precisely set out in *Reid v. State,* 200 Md. 89, 92-93, 88 A. 2d 478, 479:
>
>> " 'The imposition of sentence in a criminal case in this State is a matter peculiarly within the province of the trial judge who hears the case and sees the witnesses and the accused. It is not cruel and unusual punishment if it is within the statutory limits prescribed for the crime of which the accused is found guilty, and the trial court alone has the right to determine the penalty within these limits. * * * The sentence in the case before us is within the statutory limit. * * * We have been referred to several cases from other jurisdictions which allow their appellate courts

to review sentences. * * * As we have pointed out, the law in this State is different, and we have no such power, so that the decisions in these cases are not authority for our taking any such action.

" 'Where the punishment is grossly and inordinately disproportionate to the offense, "so that the sentence is evidently dictated not by a sense of public duty, but by passion, prejudice, ill-will or any other unworthy motive, the judgment ought to be reversed, and the cause remanded for a more just sentence." *Mitchell v. State,* 82 Md. 527, 534, 34 A. 246, 247; *Apple v. State,* 190 Md. 661, 668, 59 A. 2d 509; *Von den Bosch v. Swenson,* 194 Md. 715, 70 A. 2d 599. The reports of this court disclose no case in which such action has ever been taken by it.' See also *Merchant v. State,* 217 Md. 61, 70, 141 A. 2d 487.

"As was held in *Reid*: 'In the case before us, we see no occasion to hold the punishment comes within the exception suggested in *Mitchell v. State, supra.* '"
(247 Md. at pages 532, 533, 233 A. 2d at page 792.)

In our opinion, we are bound by the prior decisions of this Court to hold that the imposition of the death penalty for the first degree murders of Sheriff Graham and Deputy Sheriff Kelly was not a cruel and unusual punishment forbidden by the Declaration of Rights in the Maryland Constitution.

The appellant, however, although recognizing the effect of the prior decisions of this Court, argues that a proper consideration of cases in the Federal appellate courts and in some State appellate courts should lead us to overrule those prior cases and now hold that the imposition of the death penalty in the present case was "cruel and unusual punishment."

It would serve no useful purpose and would substantially prolong this opinion to review all of the decisions of the Supreme Court of the United States and other Federal courts cited by the appellant. It is sufficient to observe that notwithstanding Mr. Justice Frankfurter's clear exposition in his concurring opinion in *Louisiana v. Resweber,* 329 U. S. 459, 466, et seq., 67 S. Ct. 374, 377, et seq., 91 L. Ed. 422 (1947) that the provisions of the Eighth Amendment of the Federal Constitution (as well as of other provisions of the first eight amendments) do not apply to the States through the due process clause of the Fourteenth Amendment, *Robinson v. California,* 370 U. S. 660, 666, 82 S. Ct. 1417, 8 L.Ed.2d 758 (1962) appears to *imply,* at least, in the majority opinion that the provisions of the Eighth Amendment do possibly apply to the States, although it would seem that the decision could rest on the due process provisions of the Fourteenth Amendment quite apart from consideration of whether or not the punishment in *Robinson* was "cruel and unusual." See the concurring opinion of Mr. Justice Harlan, 370 U. S. at 678-79, 82 S. Ct. at 1426-27, 8 L.Ed.2d at 769-70, one of the two concurring opinions necessary for the decision in *Robinson.* See also the dissenting opinion of Mr. Justice White, 370 U. S. at 689, 82 S. Ct. at 1430-32, 8 L.Ed.2d at 773-76. See, however, *Powell v. Texas,* 392 U. S. 514, 88 S. Ct. 2145, 20 L.Ed.2d 1254 (1968), which appears to limit *Robinson* to its particular facts and not to apply the Eighth Amendment *generally* to the States through the due process clause of the Fourteenth Amendment. Whatever may be the present state of the law in the Supreme Court of the United States in this regard, there is *no decision* of that Court which holds that the imposition of the death penalty as punishment for the deliberate murder of two law enforcement officials during an escape from lawful custody is "cruel and unusual punishment" and we rather doubt that it will ever so hold. Until it does, we shall adhere to the previous decisions of this Court already mentioned.

At the argument, the appellant referred us to the de-

cision of the United States Court of Appeals for the Fourth Circuit in the very recent case of *Ralph v. Warden, Maryland Penitentiary*, decided December 11, 1970, 438 F. 2d 786. This opinion reviews prior cases, statutes, law review articles and various data relative to the death penalty with a consideration of the various arguments for and against its constitutionality. We have read this decision with care and observe that, quite apart from the reasoning in the case upon which we make no comment, it is not applicable in the present case by its own terms. The *Ralph* case applied only to rape which did not take or endanger the life of the victim, *and not to all rapes*. As Circuit Judge Butzner stated for the Fourth Circuit:

> "Lest our opinion be given a breadth greater than is necessary for the decision of this case, we do not hold, despite the argument of the amicus curiae, that death is an unconstitutional punishment for all rapes."

*Ralph* obviously does not apply to the deliberate murder of two law enforcement officials during an escape. Further, a decision by the Fourth Circuit, although entitled to respect, is not binding upon this Court.

We note that there are two cases presently pending before the Supreme Court of the United States involving the death penalty, *McGautha v. California* and *Crampton v. Ohio*, 39 U.S.L.W. 3213 (Nos. 203 and 204, October Term, 1970, Argued November 9, 1970), which may possibly resolve the question of the constitutionality of the imposition of the death penalty in the United States but at the present time there is no decision of the Supreme Court of the United States which prevents us from following our prior decisions already mentioned and, as we have indicated, we shall adhere to them.

### 2.

The appellant next contends that he was never identified as the perpetrator of any of the crimes charged by the State. We do not agree with this contention. We have

already set out in some detail the testimony of various witnesses for the State who identified the appellant as the perpetrator of the crimes charged in the four indictments. That testimony shows that Walston identified the appellant as a resident of the jail on December 8, 1968, when Walston was in charge of the jail. Two inmates of the jail, Harmon and Horsey, testified that prior to December 8, they were acquainted with the appellant and saw him talking with Deputy Sheriff Kelly prior to his murder. Harmon testified that he saw the appellant emerge from Cell No. 1 with a pistol in hand after he saw the victims fall. Horsey testified that he actually saw the appellant's arm reach around the door and fire the gun. Pusey testified that the appellant fired a .22 caliber revolver point blank at him while making his escape from the jail. Little, of the Delaware State Police, testified that he had recovered a .22 caliber revolver from the motel room occupied by the appellant prior to his arrest. This .22 caliber pistol was identified by the State's ballistics expert as the same weapon which fired the bullets which killed Sheriff Graham and Deputy Sheriff Kelly. In addition to all of this, the appellant himself testified on cross-examination that he had received "instructions" to kill Nixon because he "was head of the Communist Party," and further:

"Q. Were you also instructed to eliminate Samuel Graham and Albert Kelly?
"A. I am instructed to eliminate all Communist agents.
"Q. Well, did you eliminate Samuel Graham and Kelly?
"A. Yes, I did. I eliminated him thoroughly."

The appellant seeks to overcome this testimony by giving a definition from Webster's New Collegiate Dictionary of the word "eliminate" as "to get rid of: expel; to set aside as unimportant: ignore; to expel from the living body; to cause to disappear by combining two or more equations." In the context, however, it is clear to us that

the appellant understood and used the word "eliminate" as meaning that he shot and killed both Sheriff Graham and Deputy Sheriff Kelly.

The appellant relies on a decision of the Court of Special Appeals in *Rife v. State,* 9 Md. App. 658, 267 A. 2d 326 (1970) to support his contention that the State did not meet its burden of proving the identity of the appellant as the perpetrator of the crimes charged. In our opinion, this reliance is misplaced. *Rife* involved a warrantless arrest by a police officer of a person who did not commit any crime in his presence in which the State failed to prove probable cause on the arresting officer's part to make the arrest in that it was not shown that a physical description of the suspects matched the description of the robbery suspects or that the arresting officer had any reason to believe the person he arrested had committed the felony in question. As we have observed, the facts in the present case are quite different from those in the *Rife* case.

The appellant also cites *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967) for the proposition that the alleged failure of the State to identify the appellant cannot be considered harmless error "because the Appellant took the stand." The facts in the instant case are also quite different from those in *Chapman* which involved comments by the prosecutor upon Chapman's *failure to testify in her own behalf.* In any event, the State, in our opinion, *did* offer evidence sufficient to justify the jury's conclusion that the appellant was the perpetrator of the crimes charged so that there was no error in this regard—harmless or otherwise.

### 3.

The appellant next argues that the Maryland single verdict procedure violated the privilege of the appellant against self-incrimination. We do not find this argument to be sound.

Code (1967 Repl. Vol.), Art. 27, § 413 provides:

"Every person convicted of murder in the

first degree, his or her aiders, abettors and coun-
sellors, shall suffer death, or undergo a confine-
ment in the penitentiary of the State for the
period of their natural life, in the discretion of
the court before whom such person may be tried;
provided, however, that the jury in a murder
case who render a verdict of murder in the first
degree, may add thereto the words 'without
capital punishment,' in which case the sentence
of the court shall be imprisonment for life, and
in no case where a jury shall have rendered a
verdict in manner and form as hereinbefore pre-
scribed, 'without capital punishment,' shall the
court in imposing the sentence, sentence the con-
victed party to pay the death penalty."

The appellant contends that although § 413 may op-
erate to mitigate the severity of punishment, "it is an
impermissible authorization in that it tends to discourage
a basic constitutional right: the privilege against self-in-
crimination." The appellant argues that the defendant in
a first degree murder case is placed in the dilemma of
either testifying in his own behalf to mitigate the pos-
sible punishment or to refuse to so testify in order to
maintain his privilege against self-incrimination, so that
this has a "chilling effect" on the exercise of a basic con-
stitutional right, *i.e.*, the privilege against self-incrimi-
nation. The appellant relies principally on *United States
v. Jackson*, 390 U. S. 570, 88 S. Ct. 1209, 20 L.Ed.2d 138
(1968); but, in our opinion, the *Jackson* case does not
sustain the appellant's contention. In *Jackson*, the ma-
jority of the Supreme Court invalidated a provision of
the Federal Kidnapping Act which provided that the
death penalty shall be imposed if the jury should so rec-
ommend on the theory that this provision discourages
the right of an accused under the Fifth Amendment of
the Federal Constitution not to plead guilty. It is appar-
ent, we think, that the statutory plan involved in *Jackson*
is quite different from that involved in the present case.
In the *Jackson* case the Federal statute authorized the

jury to require that the death penalty be imposed. Under § 413 the death penalty is one of the alternative punishments provided for in the statute for imposition *by the trial judge.* The jury by adding the words "without capital punishment" to its verdict *prevents* the trial judge from imposing the alternative death penalty. The ultimate penalty is imposed by the trial judge. It is neither constitutionally necessary nor desirable for the practical administration of criminal justice to require *separate* trials of the question of guilt, on the one hand, and of punishment, on the other, as would be the logical result if the appellant's contention were sound. A somewhat analogous situation is that involving a separate determination by a special verdict of the jury in regard to the sanity of an accused in a first degree murder case after a plea that the defendant was not guilty by reason of insanity at the time of the commission of the alleged crime pursuant to Code (1968 Repl. Vol.), Art. 59, § 9. We held in *Tull v. State,* 230 Md. 596, 188 A. 2d 150 (1963) that the accused in that case (also sentenced to death) was not entitled to a separate trial on the issue of insanity. The practice in this State has always been to have *one trial* on all of the issues involved in murder cases and we find no reason to depart from this uniform and long continued practice. On the contrary, it is our opinion that a bifurcated trial would be most undesirable.

Nor do we find any decision of the Supreme Court of the United States which holds that § 413 and a single trial on all issues in the murder case deprive a person of any constitutional right. We understand that the case of *Crampton v. Ohio, supra,* now pending before the Supreme Court, involves an Ohio statute permitting a jury to fix the death sentence in a "single verdict" after a determination of guilt. Although the Ohio statute appears to be different from § 413, it is sufficient to observe at this time that the *Crampton* case has not yet been decided by the Supreme Court. We might point out, however, that on November 23, 1970, the Supreme Court of the United States, in reversing the United States Court

of Appeals for the Fourth Circuit, decided in *North Carolina v. Alford,* 400 U. S. 25, 91 S. Ct. 160, 27 L.Ed.2d 162, that the voluntary and knowledgeable entry in a murder case of a plea of guilty to the commission of murder in the second degree, with the advice of competent counsel, in order to escape the risk of the imposition of the death penalty was constitutionally permissible under the Federal Constitution even though the accused contended that he was innocent of the crime. Mr. Justice White, for the Supreme Court, stated:

> "We held in *Brady v. United States,* 397 U. S. 742 (1970), that a plea of guilty which would not have been entered except for the defendant's desire to avoid a possible death penalty and to limit the maximum penalty to life imprisonment or a term of years was not for that reason compelled within the meaning of the Fifth Amendment. *Jackson* established no new test for determining the validity of guilty pleas. The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. See *Boykin v. Alabama,* 395 U. S. 238, 242 (1969); *Machibroda v. United States,* 368 U. S. 487, 493 (1962); *Kercheval v. United States,* 274 U. S. 220, 223 (1927). That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage." (400 U. S. at 31, 91 S. Ct. at 164.)

In the present case, although no plea of guilty was involved, the appellant was presented with a tactical choice of exercising his undoubted right not to testify or to testify and subject himself to cross-examination by the

State. We have never understood that the constitutional right against self-incrimination permits a defendant who elects to testify in his own behalf to confine his testimony to evidence he believes to be favorable to him but precludes the jury from hearing evidence which may be unfavorable to him.

There is no question in the present case that the appellant voluntarily elected to testify in his own behalf, after having been advised by his competent counsel in open court that he was not required to testify and that neither the trial court nor the jury could infer from his not taking the stand that he was guilty of any crime. The appellant indicated that he desired to take the stand.

It is rather clear from the appellant's testimony that he was hopeful that the jury would find him not guilty by reason of insanity inasmuch as his testimony was directed to his hearing of voices that directed him as a Democrat to get rid of Communism. He stated in effect that not only was President Nixon a Communist but that the trial judge, the prosecutor and the enforcement officials, including the sheriff, were Communists. Indeed, he testified that he told Sheriff Graham that he, the Sheriff, was a Communist, whereupon the sheriff allegedly "threw coffee on me" in the Wicomico County Jail. He testified that he was only doing what he was "supposed to do" which was to "get rid of certain people. I have to eliminate them. They have to be eliminated." When asked why, the appellant replied, "They are Communists." He was then asked on direct examination:

"Q. Well is that any reason to eliminate them?

"A. Yes. It is like over in Viet Nam, we are killing Communists over there and we have to get rid of them here. They took me and made me a prisoner of war and put me in Wicomico County jail. It is my duty as a Democrat to get rid of these people and get this country back on its feet. We got inflation and everything else."

He then read a speech he had prepared which ended with the peroration:

"My friends of great knowing, come rally behind me and let's destroy these Communist police. And we will get them sooner or later."

The appellant offered no evidence in regard to mitigation of punishment. Rather, his testimony was directed at the hearing of voices and casting himself in the role of a person leading the fight to rid the country of Communist leaders and Communist police.

The jury, however, as we have noted, found the appellant sane, probably considering that these extravagant statements by the appellant were made with the hope of being found incompetent. He had expressed this intention at Perkins, and Dr. Riener was of the opinion that he was "attempting to malinger mental illness."

It is apparent that the appellant elected to testify to attempt to sustain his plea of not guilty by reason of insanity and not to produce evidence in mitigation of punishment. It was only after his tactic failed that mitigation of sentence became important. His efforts in this regard, however, should be directed to the Governor for the granting of clemency and not to this Court. As Chief Judge Hammond stated for the Court in *Jones v. State,* 247 Md. 530, 534, 233 A. 2d 791, 793 (1967):

"Although this Court and the Review panel [in the *Jones* case] lacked jurisdiction to review the appellant's sentence, Art. II, § 20 of the Constitution of Maryland gives the Governor the 'power to grant reprieves and pardons' and under this provision and those of Code (1965 Repl. Vol.), Art. 41, § 120, many governors have commuted sentences."

See also *Robinson v. State,* 249 Md. 200, 214, 238 A. 2d 875, 883 (1968).

### 4.

The appellant contends the trial court erred in instruct-

ing the State's Attorney in regard to how to frame questions to enable the State's expert testimony to be heard. In our opinion, this contention is without merit.

After several questions to Dr. Sauer by the State's Attorney in regard to his ultimate opinion relating to the appellant's mental capacity on December 8, 1968, objection to which had been sustained by the trial court, counsel for both parties were called to the bench and the following occurred out of the hearing of the jury:

"(The Court) You are leaving out several things. No. 1 is medically speaking is this something that you can base it on. Is that recognized medically as the method of doing it, that he has described.

"No. 2 is based on reasonable medical certainty does he have an opinion and if so what is it?
You are leaving out the—

"(Mr. Garrity) I object to your educating the prosecution, Your Honor.
"(Whereupon, counsel returned to the trial tables and the following proceedings were had in open court in the hearing of the jury:)

"By Mr. Truitt:

"Q. Doctor, is the staff conference, is this procedure which you have just described, a recognized method of diagnosing in psychiatric circles? A. Yes, it is.

"Q. And as a result of this conference and with reasonable medical certainty, were you able to form an opinion? A. Yes.

"(Mr. Garrity) Objection.

"(The Court) An opinion as to what?

"By Mr. Truitt:

"Q. As to his condition on December 8, 1968.

"(Mr. Garrity) Objection.

"(The Court) You may answer 'yes' or 'no'.

"(The Witness) Yes.

"By Mr. Truitt:

"Q. And what is that opinion?

"(Mr. Garrity) Objection.

"(The Court) Overruled.

"(The Witness) It is my opinion that at the time he was not suffering from a mental disease or defect of such severity that would cause him to lack substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law."

Our predecessors have sustained the right of a trial judge in a first degree murder case to intervene in the questioning of witnesses (including the defendant) during the course of a jury trial. *Madison v. State,* 200 Md. 1, 12, 87 A. 2d 593, 598 (1952). See *Jefferies v. State,* 5 Md. App. 630, 632, 633, 248 A. 2d 807, 809 (1969) in which the trial judge asked 47 questions of the witnesses for the prosecution and 108 questions of the witnesses for the defendant in a non-jury larceny case and this was held not to be in any way unfair but showed that the "trial judge was being meticulously careful to make sure that the full facts were brought out so that his decision would be absolutely correct."

It is well settled in Maryland that the trial judge has a wide discretion in the conduct of a trial and that the exercise of his discretion will not be disturbed unless it has been clearly abused. *Plank v. Summers,* 203 Md. 552, 554, 555, 102 A. 2d 262, 263 (1954). The action of the trial judge in the present case to seek to expedite the case and to pose the proper questions to the expert witnesses—all done outside the hearing of the jury—is not an abuse of discretion, but, indeed, was proper and commendable conduct on his part. We see no error in this regard.

### 5.

The appellant next contends that he was not represented by counsel at an extradition hearing in Delaware

—alleged to be a critical stage in the prosecution—and was thereby denied the right to assistance of counsel contrary to his rights under the Sixth and Fourteenth Amendments to the Federal Constitution. He relies principally on *Coleman v. Alabama,* 399 U. S. 1, 90 S. Ct. 1999, 26 L.Ed.2d 387 (decided June 22, 1970), which held that the accused in that case was denied his constitutional right to assistance of counsel under the amendments mentioned when no counsel for him was present at the preliminary hearing in Alabama. We have found no decision of the Supreme Court holding that an extradition proceeding is a preliminary hearing at which counsel for the accused need be present; and we would not think it would be. The short answer to the appellant's contention, however, is that the *Coleman* case, in any event, only applies in cases in which a preliminary hearing was held on or after June 22, 1970, the date it was decided; and the present case was decided several months prior to that date. See *Billings v. State,* 10 Md. App. 31, 35, 267 A. 2d 808, 810 (July 16, 1970).

## 6.

The appellant's next contention is that the rebuttal testimony of the State in regard to the appellant's sanity was insufficient.

We have already set out the substance of the testimony of Dr. Sauer and of Dr. Riener and need not repeat it here. In our opinion these rebuttal witnesses for the State had sufficient opportunity to observe and evaluate the appellant and to conclude that, in their opinion, the appellant was sane under the Maryland statutory test at the time of the commission of the offenses charged.

As Judge Horney, for the Court, stated in *Royal v. State,* 236 Md. 443, 448, 449, 204 A. 2d 500, 503 (1964):

> "[W]e have consistently held that in order to overturn a judgment entered on the verdict of a jury for insufficiency of the evidence it is necessary to show that there was no legally sufficient evidence or inferences drawable therefrom on

which the jury could find a defendant guilty beyond a reasonable doubt. *Coates v. State,* 232 Md. 72, 191 A. 2d 579 (1963)."

As we have seen, this was clearly not the situation in the present case.

### 7.

The appellant's final contention in his brief and before us at the argument was that the trial court erred in not instructing the jury as the appellant requested.

Maryland Rule 756 b, in regard to advisory instructions in criminal cases, provides:

"The court may and at the request of any party shall, give such advisory instructions to the jury as may correctly state the applicable law; the court may give its instructions either orally or in writing. The court need not grant any requested instruction if the matter is fairly covered by the instructions actually given. The court shall in every case in which instructions are given to the jury, instruct the jury that they are the judges of the law and that the court's instructions are advisory only."

We sustained the application of Rule 756 b in a murder case in *Brown v. State,* 222 Md. 290, 159 A. 2d 844 (1960) and held that although the defendant's requested instruction correctly expressed the applicable Maryland law, the trial court need not grant that specific instruction if the trial court "fairly covered" the requested instruction in the instruction actually given. See also *Cropper v. State,* 233 Md. 384, 197 A. 2d 112 (1964) to the same effect.

The appellant does not point out any specific instance in which any one of the 19 instructions requested by the appellant was not fairly covered by the advisory instructions of the lower court. Our examination of the comprehensive and carefully considered advisory instructions of the trial judge, as amplified and corrected at the appel-

lant's request in certain regards, consisting of approximately 19 printed pages in the record extract, indicates that all and every part of the appellant's requested instructions, which properly set forth the applicable law, were fairly covered by the advisory instructions of the trial court and, as we have observed under Maryland Rule 756 b and our prior decisions, this was sufficient.

*The Points Raised by the Appellant*

In regard to the points raised by the appellant concerning the alleged incompetence of the appellant's court appointed counsel, as permitted by our order, already mentioned, we find that there is no merit in them.

First of all, there was no suggestion by the appellant at any time during the trial that his counsel was incompetent and none of the five points now raised by him was mentioned by the appellant during the trial or at the time of sentencing. The trial court before sentencing the appellant gave the appellant full opportunity to speak. The record shows the following:

> "THE COURT: Bartholomey, stand up.
>
> "In addition to what has been said, is there anything you want to say before the Court determines the sentence in these cases?
>
> "THE DEFENDANT JOSEPH JAMES BARTHOLOMEY: No, I don't think it would really make any difference to knock myself out.
>
> "THE COURT: Very well, if you have nothing further to say you may be seated."

The trial judge then proceeded to give his reasons for imposing the death sentence in the two first degree murder cases, pointing out that he had deliberately delayed sentencing until December 30, 1969—some two and one-half months after the verdict on October 8, 1969, and some two months after the denial of the motion for a new trial on October 29, 1969—so that he could carefully consider the pre-sentence report of the Department of Parole and Probation as well as the facts in the entire case.

The appellant was present at the argument upon his

motion for a new trial; but he made no suggestion at that time that his counsel was incompetent even after the trial court overruled his motion.

When the appellant, on January 26, 1970, executed his affidavit as an indigent to have counsel on appeal appointed for him, he did not indicate that his trial counsel, Mr. Garrity, should not be appointed as such appellate counsel because of any alleged incompetency; and Mr. Garrity was in due course so appointed.

Mr. Garrity was quite active on the appellant's behalf prior to the trial of the case on October 8, 1969. He had the case removed from Wicomico to Charles County. He obtained Orders from the lower court for the independent examination of the appellant by psychiatric and psychological experts, for the employment of an investigator, for the employment of Thomas J. Aversa, Esquire, as additional counsel to assist him (all this at the expense of the State), and an elaborate Order requiring the State's Attorney to disclose certain relevant and material evidence in his possession. On September 29, 1969, Mr. Garrity petitioned for the issuance of a writ of habeas corpus ad testificandum to obtain the attendance of an inmate of the Maryland Penitentiary to testify for the appellant. On the same day, he issued subpoenas for 10 witnesses to testify. On October 2, 1969, he issued a subpoena duces tecum for the records of the appellant at the Crownsville State Hospital as well as subpoenas for two physicians and a subpoena duces tecum for the records of the Department of Juvenile Services.

At the beginning of the trial, he had the prospective jurors examined on their voir dire, presenting seven relevant questions to them.

A careful consideration of the entire record—including the matters preliminary to the trial itself, the 19 requests for instruction presented by counsel for the appellant, his exceptions to the charge of the trial court—resulting in some amplification and correction of the charge —his argument to the jury, his motion for a new trial and his argument on that, his request for a pre-sentence

report and his moving plea at the time of sentencing that capital punishment not be imposed, and his later application for review of sentence—indicates to us that counsel for the appellant was a competent attorney, well versed in the criminal law and gave the appellant complete and fair representation in this case. This is not surprising in view of the fact that Mr. Garrity had been at one time an Assistant State's Attorney in Baltimore City and after leaving that office had, in private practice, defended persons accused of crime.

Counsel for the appellant did state in the course of his pre-sentencing remarks that in his nine years of law practice, either as defense counsel or as prosecutor, he had never been involved in a case in which the death penalty had been imposed, but also indicated that he had never asked that the death penalty be imposed.

In his peroration of his plea prior to the sentencing counsel for the appellant, after remarking that he had been present in court on one occasion in which the death penalty was imposed and the court added "May God have mercy on your soul," stated that if such a sentence should be imposed in the present case:

> ". . .that God will not only have mercy on this defendant's soul, but all of us here who have been participants, you as the Judge who would impose it, if it is imposed, for perhaps maybe not showing compassion, Christ-like compassion that we should try to adhere to in my belief.
>
> "To me, perhaps because maybe I didn't give enough to this defendant, maybe I wasn't eloquent enough or clever enough to give him as much as perhaps someone else could have; to the State because maybe they pushed too hard for the taking of someone else's life, because two other persons life's [sic] were taken.
>
> "I plead with Your Honor that God will have mercy on our souls."

This apparently is the source of the appellant's fourth point raised by himself.

It is apparent to us that counsel for the appellant was thoroughly familiar with the evidence presented on behalf of the appellant in the trial below, both expert and lay. His trial tactics were sound, in our opinion; and he obviously had obtained in his five visits to the appellant in prison sufficient information to prepare and properly present a competent defense for the appellant. The appellant does not state the name of the witness he requested be called to testify, or what testimony was expected to be elicited from that witness. The material alleged in the fifth point, if assumed to be factual, obviously resulted in no prejudice to the appellant.

We were favorably impressed with the brief filed by counsel for the appellant and by his argument before us on behalf of the appellant. This opinion rather indicates that he omitted no possible points and did not neglect those points raised in his brief and argument before us. In our opinion, the appellant was quite adequately represented by his counsel at the trial below and in this Court. He had a fair and impartial trial in which he was forcefully and competently defended by his counsel.

*Judgments affirmed.*