## OLLIE SMITH, JR. *v.* STATE OF MARYLAND

[No. 71, October Term, 1947.]

598

 

*Decided January 16, 1948.*

Appeal from the Circuit Court for Dorchester County (HENRY, C. J., and JOHNSON and BAILEY, JJ.).

Ollie Smith, Jr., was convicted of rape, assault with intent to rape and common assault, and he appeals.

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Calvin A. Douglass*, with whom was *Donald G. Murray* on the brief, for the appellant.

*J. Edgar Harvey, Assistant Attorney General*, with whom was *Hall Hammond, Attorney General*, on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

On May 14, 1947, the Grand Jury for Dorcester County returned an indictment against Ollie Smith, Jr., which contained three counts. The first count charged rape. the second assault with intent to rape, the third count, common assault upon Florence May Henry on the 3rd day of May, 1947, at Dorchester County, Maryland.

Smith was arraigned on May 21st. The record shows, on that day the court stated it had appointed Messrs. McAllister and Trice to defend him, and the case was immediately called for trial before a jury, at the election of the accused.

The next day the jury found him guilty under all three counts in the indictment, and the court thereupon sen-

tenced him to be hanged. He appeals here. Thereafter Messrs. McAllister and Trice struck out their appearance for the accused, and Mr. Calvin A. Douglass entered his appearance for him, and has prosecuted the appeal in this court.

Five points were argued in this court, *viz*:

1. Was there error in the admission of the confession by the accused?

2. Was the taking of the testimony in the presence of the jury, for the purpose of laying a foundation for the admission of the confession, reversible error?

3. Was there error in the admission of photographs showing footprints at the scene of the crime?

4. Was the evidence submitted to the jury sufficient to warrant their verdict?

5. Was there a failure of due process of law in that counsel was appointed for the accused by the court on the same day he was put upon trial?

The facts of this case, stated in narrative form, are as follows: Florence May Henry, her brother, Norman Henry, her sister, Mary Elizabeth Henry, and a small child of Florence, lived in a small two story house situated on a country road in a rural section of Dorchester County. There is a short lane leading from the road to the house. They had resided there for about four years before this crime occurred. Florence was twenty-two years old, Norman was twenty years old, and Mary would have been seventeen the following July. About a quarter of a mile from their home, on this road lived their uncle, Frank Henry, and about a half mile from his home is the town of Hurlock. There is a woods about a quarter of a mile from the road in front of the Henry home, and between the road and the woods is a field. A stream, known as Gravel Branch, runs through the woods. A short distance from the entrance to the Henry home, a road called Gravel Branch Road runs down to a railroad trestle that spans the branch. The railroad crosses this country road at an angle.

On the evening of May 2nd these young women went to Federalsburg to see a moving picture, and arrived home, with two young men, at about ten o'clock. Their brother was home when they arrived. These young men left shortly thereafter, and the family retired for the night. The two girls and the child slept in one room and the brother in another. He had obtained work at a saw-mill, and was anxious to be at work on time the next morning. Later in the night he left the home and went to the home of his uncle, Frank Henry, so that Frank Henry could awaken him early the next morning. At or about one o'clock in the morning the uncle heard Mary screaming. He went to the door and there found her with the child. She informed him that a colored man had broken into the house and dragged Florence away.

Gus Webb and his sister, Grace, live a short distance from the uncle's home. At their home at the time was a man called Frank. These are colored people. Webb heard Mary screaming, and backed his automobile out to the road, and he, his sister, the man Frank, Frank Henry, Norman Henry, Mary, and the child were driven by Webb, in his car, to the Henry home. Parked a short distance from the entrance to the Henry home, on the country road, was a red truck marked with the numeral "7." Norman and his uncle started to hunt for Florence, but did not find her. Norman then went to a store conducted by James R. Brown, at Hurlock. He resided at the store building. Brown called the State Police and then went with Norman to the Henry home. He was shown a broken lamp that Mary said was kicked out of her hand by the colored man. Brown and Norman started to search for Florence. They went down Gravel Branch Road to the trestle, crossed the trestle and proceeded along a sandy way that runs along the woods to a stream that flows into Gravel Branch. Along this sandy way they saw footprints and, with the aid of a flash light, traced the footprints some distance until they came to the stream, when they heard a crackling of bushes. They halted, in the hope they would apprehend the assailant.

Brown called Florence and she answered, and came to them. She was crying, her nightgown was torn, she was barefoot, and she complained that she had been attacked by a colored man, and that he had accomplished his purpose. They proceeded to the Henry home by way of the trestle, and when they arrived at the trestle they heard a car start and proceeded in the direction of Hurlock. At about that time Webb saw this red truck start. He and these people were in his car, watching this truck. He followed it. It proceeded through Hurlock, down to a colored settlement called Bobtown, circled around it, and went to the back entrance of Mr. James Andrews' place, and entered it. Webb returned to the Henry home. State Trooper Dodson and Sheriff Robinson were there. The Trooper, the Sheriff, Brown, and Norman Henry went immediately, in the Trooper's car, to the home of Mr. Andrews, and found a red truck marked with the numeral "7" parked there. Its engine was warm.

Smith's parents lived on the Andrews place and the accused, who worked for Mr. Andrews, lived with his parents, with whom the officers talked. From there they proceeded to Bobtown, to the home of a colored man named Clifford Dodson. A colored woman came to the door and took the Trooper and the Sheriff upstairs to a bedroom, where there were several colored people sleeping. Among them was the accused. He had all his clothes off except his underclothes. They aroused him and told him he was under arrest. His coat, overalls, and shoes on which were rubber shoes, were under the bed. These, together with his hat, the officers took. The overalls were wet up to the knees. They borrowed some clothes for the accused, took him to the Trooper's car, and placed him in the back seat between Brown and Norman Henry. He was handcuffed. The Trooper and the Sheriff got in the front seat of the car, the Trooper driving, and they returned to the Henry home. There they left Brown and Norman Henry, and took the accused to the jail at Cambridge. It was getting around daybreak at that time. The

evidence is that the accused was not questioned at all until they arrived at the jail.

After Florence got back home, she was immediately taken in an automobile to the office of Dr. Anderson, in Federalsburg, who examined her. This examination revealed that the patient was very nervous and agitated and was crying. Upon examination of her body, the doctor found numerous scratches, abrasions, and bruises on both arms and both legs. The right wrist showed evidence of being bruised, as well as being scratched or pinched. She complained of her right shoulder and right elbow bothering her, but there was nothing found on her right arm, other than bruises on her right wrist. There was no evidence of fracture. There was muscular soreness. Her vagina contained semen. It was evident from this examination that this woman, shortly before, had intercourse with a man.

The evidence further showed that on the early morning of May 3rd the Henry home was broken into and a man entered, came up the steps and beat on the door of the room in which these young women and the child were sleeping. They heard him coming up the stairs, got up and tried to hold the door, but this man pushed it open, grabbed Florence and pulled her down the steps. Mary immediately lit a lamp, and came down the steps holding the lighted lamp in one hand, with the young child at her side. She saw it was a colored man. He told her to put out the light, and then kicked it out of her hand. He had Florence by the wrist, which he twisted, and dragged her out of the house, across the field, and into the woods through which Gravel Branch flows. There he raped her, and she was subsequently found as we have described. The accused was identified by Florence and Mary.

At around seven o'clock in the morning of May 3rd the prisoner was seen at the jail by State's Attorney Harrington. Present at the time was Sergt. Dodson and the Sheriff. The State's Attorney told the prisoner that he need not answer the questions if he did not want to, but

if he did answer the questions, what he said would be used against him at his trial. The State's Attorney didn't stay long. There is no evidence in the case of any improper action on the part of the State's Attorney, nor the Sheriff, nor Dodson, when he talked with the accused, and apparently the accused has no complaint about his talk with the State's Attorney, for no point was made in this regard in the brief, nor at the argument.

At about nine-thirty the accused was talked to by Lt. Randall and Sergt. Dodson of the State Police, and Sheriff Robinson. Lt. Randall, before any questions were asked him, said that he wanted to talk to him regarding the assault made on Florence May Henry in the early morning of that day. The evidence of all three of these officers is that the Lieutenant told the accused that he could answer the questions if he wanted to, but he did not have to answer them, and stated that anything he said to them would be used against him. After this statement, he talked freely, and a typewriter was procured and his statement was written down by Lt. Randall, read over to him, and he signed the same. These officers further testified that they used no coercion or force to compel the accused to confess; made no promise, nor held out any hope, to induce the accused to confess; that the confession was made of his own free will. The accused testified that Dodson, at his questioning, told him he was a liar and that he ought to have the truth beaten out of him; that the Sheriff said that he was a liar, but did not say that the truth should be beaten out of him; that the Lieutenant restrained Sergt. Dodson, and told him and the Sheriff to leave the room, which they did; that he then proceeded to talk to Lt. Randall, who acted like a gentleman. He said that the confession was not true and that he made it because of fear caused by the conduct of the officers.

1. The law regarding the admissibility of a confession has been stated by this court many times. We will restate the rule. Before a confession can be admitted in evidence, the State must show, to the satisfaction of the

court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess. If, after a consideration of both the evidence of the State and the evidence offered by an accused (if any be offered by him) regarding the matter, the court is of the opinion that the evidence shows, *prima facie,* that the confession was freely and voluntarily made, it should be admitted in evidence; and, if not, it should be rejected. The matter, in the first instance, is for the court, and involves a mixed question of law and fact. When admitted in evidence it is *prima facie* proof that the confession was freely and voluntarily made, but the ultimate fact is for the jury, and must be considered by it in the light of all the facts and circumstances of the case. If the jury, notwithstanding the confession is admitted, finds that from all the testimony in the case it has not been proved beyond a reasonable doubt that it was the free and voluntary expression of the accused, it should disregard the confession in the consideration of the guilt or innocence of the accused. If they do find that the proof shows beyond a reasonable doubt that the accused freely and voluntarily made the same, and that no coercion or force was exercised by the officers to obtain the same, nor any hope or promise was held out by them to the accused to induce him to make the confession, they should consider it, together with all the other facts and circumstance in evidence, in arriving at the verdict. See *Demby v. State,* 187 Md. 7, 48 A. 2d 586; *Jones v. State,* 188 Md. 263, 52 A. 2d 484. These decisions exhaustively deal with this question, and quote or cite many opinions of this court. We think that the confession was properly admitted in evidence, if the objection next considered does not vitiate the same.

2. The jury was present when the court heard evidence on the preliminary question of whether the confession was freely and voluntarily made. Lt. Randall

and Sergt. Dodson were examined by the State, and cross examined by the defense. Sheriff Robinson was called and examined by the State and turned over to the defense for cross examination. The record shows there was no cross examination. At that point this colloquy occurred:

"Mr. Trice: I think this should not be in the presence of the Jury. I ask that the Jury be excused.

"The Court: If this goes to the Jury, should not the Jury know all the circumstances?

"Mr. Trice: We move for a mistrial.

"The Court: I don't know whether the Jury heard it or not. If you did, you are not to consider the remark that fell from Judge Bailey's lips. We overrule your motion to excuse the Jury."

It does not appear in the record what the remark of Judge Bailey was. Not knowing what it was, we cannot rule on it, and cannot say it constituted reversible error. However, the matter would seem to have been disposed of when the court warned the jury not to consider Judge Bailey's remark. After this episode Sheriff Robinson was recalled and asked further questions regarding the obtention of the confession, by the State, and cross examined by the defense.

It is stated in 1. R. C. L., section 123, page 579:

"The better rule and the one supported by the weight of authority is that a preliminary investigation made by the court to determine whether a confession offered in evidence is voluntary and therefore admissible should be made out of the presence of the jury, especially if the defendant requests it. * * * Although the preliminary investigation into the voluntariness of the confession should take place in the presence of the court alone, the hearing of the preliminary matter in the presence of the jury is not prejudicial where the confession is admitted in evidence, for in such a case it is for the jury to decide ultimately what weight to give to the confession." *Cahill v. People,* 111 Colo. 29, 137 P. 2d 673, 148 *A. L. R.* 536, Annotated pages 546, 550; *State v. Dolbow,* 117 N. J. L.

560, 189 A. 915, 109 *A. L. R.* 1488; *State v. McCarthy,* 133 Conn. 171, 49 A. 2d 594.

We are of opinion that the best practice is to hear evidence on the preliminary question out of the presence of the jury, and we recommend such practice. In the case of *Tooisgah v. United States,* 10 Cir., 137 F. 2d 713, 716, the court said:

"The manifest purpose of this rule is to make sure that the jury shall not be influenced by knowledge of the circumstances, the substance, or contents of a confession which is in fact incompetent evidence, * * * and it is the duty of the trial court to diligently safeguard and protect the interest of the accused in this regard. If the court elects to determine the competency and admissibility of a confession in the presence of a jury, it does so at the risk of committing reversible error, because if the confession is incompetent and inadmissible, knowledge of the confession by the jury is apt to unduly influence its deliberations to the extent of depriving the accused of a fair and impartial trial, although the confession may have been excluded and the jury instructed not to consider it as part of the evidence."

And with this we are fully in accord.

We hold that as the confession was properly admitted in evidence by the court, no harm was done to the accused because the testimony on the preliminary question was taken in the presence of the jury. The jury were entitled to have and consider all the evidence regarding the same.

3. The State offered pictures of footprints found near the scene of the alleged crime. Upon objection by the defense to a portion of one of the answers, that portion of the answers objected to was sustained. When one of the pictures was offered in evidence the defense objection thereto was sustained. Near the close of this testimony counsel for the defense stated: "If they are the only pictures you are going to offer, we withdraw our objection." As there was no objection to these pic-

tures being offered in evidence, no question was reserved for this court to review. *Courtney v. State,* 187 Md. 1, 48 A. 2d 430; *Davis v. State,* 189 Md. 640, 55 A. 2d 702.

4. Section 5 of Article 15 of the Constitution of Maryland provides that "In the trial of all criminal cases, the jury shall be the Judges of Law, as well as of fact." We have quoted this provision of the Constitution many times and we repeat it here. In a trial of a criminal case, upon a seasonable objection by the defense, points of law regarding admissibility of evidence are reserved for the decision of this court. We do not review the facts to determine whether or not there was legally sufficient evidence to support the verdict. The jury, under our system, is the exclusive judge of law and fact.

The fourth point is, in effect, a demurrer to the evidence. This we are without power to consider.

5. It was argued before this court, though not referred to by counsel in the brief of the accused, that the record shows the trial court appointed counsel for the accused on the day that the case was called for trial, and that counsel had no time to consult with the accused, interview witnesses, or to prepare the case. It is urged that this deprived the accused of due process of law.

On the day of the trial, the court said to the accused: "We have appointed to defend you Mr. James A. McAllister and Mr. V. Calvin Trice. Are those two lawyers satisfactory to you?" He answered: "Yes, sir." This does not necessarily indicate that the appointment was made on that day. This statement, in the absence of any protest or objection by counsel, or request for postponement, by no means indicates that the appointment was made for the first time, without previous opportunity to counsel to prepare for the trial.

Since their argument in this Court the record has been amplified by a certificate by Judges Henry and Bailey who presided at the trial that: They called Mr. McAllister into their chambers at the courthouse in Cambridge and asked him if he would undertake the

defense of the accused and if, after talking with him, and he desired, they would appoint either Mr. V. Calvin Trice or Mr. Emerson C. Harrington, Jr., to aid him in the defense. Mr. McAllister said he would undertake the defense and would get to Elkton the next day, where the accused was confined in the jail, and interview him, and then advise the judges if he desired the services of Mr. Trice or Mr. Harrington. On May 5th Judge Henry gave him a letter to the Sheriff of Cecil County, requesting the sheriff to allow Mr. McAllister to interview the accused. He subseqüently requested the court to appoint Mr. Trice to help him in the defense.

By this certificate it appears that Mr. McAllister was appointed by the court on May 5th to defend the accused and later Mr. Trice became associated with him in the defense. It thus appears by this certificate that between May 5th and May 21st, when the trial commenced, counsel had fifteen full days, including Sundays, to prepare the case for the defense. This was sufficient time.

Every citizen is entitled to employ counsel when put upon trial for a criminal offense, and if the crime involved is a grave one, under some circumstances it is the duty of the court to appoint counsel for the accused. Under some circumstances the failure to appoint counsel for accused would be a violation of due process of law. In all criminal cases, where the death penalty can be imposed upon conviction, it is imperative that the court appoint counsel to defend the accused. Not to do so is a violation of due process of law. The courts of this State are authorized to appoint counsel to assist the State in a criminal case and to defend an accused at the expense of the State, "* * * whenever in the judgment of the court * *. * public interest requires it." Art. 26, secs. 7 & 8, Code 1939. And counsel appointed to defend one charged with crime must be given a reasonable time to prepare his client's case for trial. It would be a great injustice to the accused to appoint counsel for him and immediately put the accused upon trial without an opportunity to the counsel to thoroughly

investigate the case. While a speedy trial of one indicted for crime is commendable, it cannot be so swift as to deprive counsel of a full opportunity to investigate and prepare his client's case. To do so would be a violation of due process of law. Due process of law requires that the accused, in a case like this, be represented by counsel, and that his counsel be given a reasonable time within which to prepare his client's case. *Powell v. Alabama,* 287 U. S. 45—47, 53 S. Ct. 55, 77 L. Ed. 158, 54 A. L. R. 527; *White v. Ragan,* 324 U. S. 760—768, 65 S. Ct. 978, 89 L. Ed. 1348; *Avery v. Alabama,* 308 U. S. 444—453, 60 S. Ct. 321, 84 L. Ed. 377.

In the Avery case the court appointed counsel for the accused on March 21st. On March 24th the case was tried. The court pointed out that the county in which the crime was committed was largely rural, and that the population of the county seat was about one thousand. Two active practitioners were appointed by the court to defend the accused. They knew, and were well known by the citizens of the county. Their defense of the accused was vigorous, and his rights were fully defended by them. And that the trial was fair and impartial. Under these circumstances, it held that the due process clause of the Fourteenth Amendment to the United States Constitution was not violated. Under the circumstances of this case, we feel that the due process clause of the Fourteenth Amendment to the Constitution of the United States was not violated.

*Judgment affirmed.*