## BRICE *v.* STATE OF MARYLAND

[No. 156, September Term, 1971.]

*Decided January 21, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Joseph H. Thomas, Jr.,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Anton J. S. Keating, Assistant State's Attorney for Baltimore City,* and *Donaldson C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, Willie Frank Brice, was convicted by a jury in the Circuit Court for Cecil County of murder in the first degree, rape, robbery with a deadly weapon and perverted sexual practice. The case originated in the Criminal Court of Baltimore but was removed by the defendant, Brice, to the Circuit Court for Cecil County. The lower court, J. DeWeese Carter, C. J., and Roney, J., sentenced Brice to death in the gas chamber upon the indictments for rape and also for murder, to 10 years imprisonment upon the robbery indictment and to 10 years imprisonment upon the indictment for perverted practice to run consecutively with the robbery sentence. Upon application for review of sentence before a panel of Rasin, Clark and Turner, JJ., the panel affirmed the death penalty for the murder conviction, reduced the death penalty for the rape conviction to life imprisonment, increased the sentence for robbery with a deadly weapon from 10 to 20 years imprisonment and affirmed the sentence of 10 years imprisonment for perverted

practice, all sentences to run consecutively to each other. A timely appeal was taken directly to this Court, the case involving the death penalty.

The trial upon the indictments in the Circuit Court for Cecil County was the second time the case was tried. The original trial was in the Criminal Court of Baltimore before Liss, J. and a jury. Brice was convicted under all four indictments and was sentenced to death for murder and rape, to 10 years imprisonment on the robbery with a deadly weapon indictment and to 10 years imprisonment upon the perverted practice indictment, to run consecutively with the death sentences. Two motions of the defendant, Brice, had not been passed upon by Judge Kenney—then in the Criminal Court of Baltimore—and these motions were inadvertently overlooked and were not passed upon prior to Brice's convictions and sentences. Upon appeal to us, we concluded that the failure to pass upon these motions was prejudicial to the defendant, Brice. We reversed the judgments and remanded the case for a new trial. See *Brice v. State,* 254 Md. 655, 255 A. 2d 28 (1969). After the remand, Brice, as we have indicated, removed the case to the Circuit Court for Cecil County for trial with the results above set forth.

When the case came on for trial on February 16, 1971, the lower court denied Brice's motion to dismiss the indictments alleged to have been based on inadmissible evidence. Later, Brice withdrew his pleas of not guilty by reason of insanity which he had filed on January 19, 1971. Chief Judge Carter then examined the prospective jurors on their *voir dire* in regard to conscientious or religious scruples relating to capital punishment as such scruples would affect their ability to render a fair and impartial verdict based upon the evidence in the case. There being four separate indictments, it was agreed between counsel for the respective parties that the defendant, Brice, was entitled to 80 peremptory challenges and the State was entitled to 40 peremptory challenges. At the conclusion of the *voir dire* examination by the

lower court, it permitted the State to exercise 15 of its 40 peremptory challenges, thus excusing 15 prospective jurors who had indicated scruples in regard to the death penalty. This will be discussed later in this opinion. It was also agreed that the four cases should be consolidated for trial.

After counsel for the State concluded his opening statement (counsel for Brice having reserved his opening statement until after the end of the State's case, at which time he made an opening statement for the defendant), the State produced four police officers to relate the physical circumstances surrounding the events of August 2, 1964, out of which the present case arose. Certain photographs showing the physical surroundings, the body of the decedent, John Calvin Richmond, and a large kitchen knife, the murder weapon, were identified and introduced into evidence.

Thereafter, the State introduced the testimony of Dicie Mae Richmond, wife of the decedent, who was the prosecuting witness and sole eye witness. Mrs. Richmond testified that her husband and Brice had lived in the same home town in South Carolina and had been raised together. However, she had only met Brice through her husband in 1948 or 1949. Mrs. Richmond and her husband lived at 2650 West Franklin Street in Baltimore City. Their residence had two stories. On the first floor, the steps lead to the second floor from a living room. There was a kitchen behind the living room. On the second floor, there were three bedrooms and a bathroom. In the basement, there was a toilet. The Richmonds, who were married in 1942, operated a grocery store at 605 Dolphin Street. Most of the cooking for their meals was done at the grocery store, rather than at their Franklin Street home. Mr. Richmond took care of the meats at the grocery store and Mrs. Richmond took care of the sales and receipts. Brice came to the grocery store in 1964 and, against her wishes, her husband allowed Brice to rent a room on the second floor of the Franklin Street

home, paying a nominal rent. Brice became a roomer some two weeks prior to August 2, 1964.

On the Thursday prior to August 2, Brice had come to Mrs. Richmond's room and attempted to get in bed with her. She resisted him physically and he desisted in his efforts. Prior to August 2, Mr. Richmond and the defendant, Brice, had a dispute in regard to a gun owned by Mr. Richmond which had a broken firing pin and would not operate.

On the evening of Saturday, August 2, 1964, the Richmonds and Brice closed the grocery store at approximately 9:00 p.m. They went to the home of Bubbles Robinson where they had some drinks. They then went to a seafood establishment at the corner of Monroe Street and Warwick Avenue, where Mrs. Richmond bought some crabs. When they arrived at the Franklin Street home, Mrs. Richmond prepared the crabs. When the crabs had been eaten, Mr. Richmond went into the living room and lay down on the sofa apparently to sleep. Mrs. Richmond also went into the living room and sat on a chair near the stairway. As she sat there reading, Brice, who had previously gone upstairs, came down the stairs, went into the kitchen and thereafter entered the living room.

The following testimony of Mrs. Richmond is rather grisly. Mrs. Richmond heard Brice mumble something, but did not look up immediately. She then heard her husband say "whomp" and then looked up to see Brice standing over her husband—who was still on the sofa— stabbing him with her large kitchen knife. She saw blood gush from her husband's chest. She then ran to her husband and asked Brice why he was stabbing her husband. She struggled with Brice, during which Brice's hand was cut, and pleaded with him to stop stabbing her husband, but to no avail. Brice then ordered Mrs. Richmond "to get upstairs" and "to take off every piece [she] had on or [she] would get the same thing." She then went upstairs. Brice followed her upstairs and placed his penis

in the mouth of the nude woman. They then heard Mr. Richmond, who had managed to drag himself upstairs and who had collapsed in the bathroom, call "Dicie Mae, Dicie Mae, help me." Brice then said to Mrs. Richmond: "Don't cry, I can't stand no crying." He then said, "Wait a minute, I am going to shut him up for good. You stay in here if you know what is good for you." Brice then went into the bathroom, closed the door and Mrs. Richmond could hear him stabbing her husband some more. She heard her husband's death rattle but could not go to him.

Brice then returned and again forced Mrs. Richmond to take his penis in her mouth and to participate in an act of fellatio. Thereafter, he demanded that she have coitus with him. Brice then carried Mrs. Richmond to her bedroom where he continued to have sexual relations with her for approximately one hour.

Brice then forced Mrs. Richmond to accompany him to the toilet in the basement and to remain beside him while he had a bowel movement. Later he forced her to turn over to him the receipts of the grocery store for August 2—approximately $100.00—and took possession of a .22 caliber revolver which her husband had instructed her to carry for her protection. Brice then removed the automobile keys for the Richmonds' car from Mr. Richmond's body and then covered the body with a chenille bedspread.

Brice thereafter instructed Mrs. Richmond to drive him in the Richmond automobile to a house in Baltimore occupied by two or three unidentified persons. Brice instructed her to "act natural" and "not to forget that he had the gun." All present drank beer for a short time when Mrs. Richmond suggested to Brice that he should take the car keys and see if the car was parked right. As he did this, Mrs. Richmond ran from the house screaming, "Where does Teresa live?" Teresa was her husband's niece. Someone directed her to Teresa's house. Mrs. Richmond then related to Teresa what had hap-

pened, after which Teresa called the police who immediately responded. Thereafter, Mrs. Richmond was taken to the police district for a physical examination. Brice was thereafter apprehended and charged as already indicated.

The lower court denied Brice's motions for judgment of acquittal and the State filed dismissals with prejudice to the State of all counts other than the first count of the respective four indictments. Brice elected not to testify in his own behalf. He offered evidence to show that Mrs. Richmond had not obtained the required permits to operate her grocery store between 1964 and 1968 apparently to contradict her testimony that she had such permits and thus to impeach her credibility.

Brice presents four contentions before us.

> 1. He was denied his rights under the Sixth Amendment to the Federal Constitution as applied to the States through the Fourteenth Amendment by the procedure in the trial court in selecting a jury.
>
> 2. The trial court erred in allowing the State to use 15 of its peremptory strikes during the course of the *voir dire* examination.
>
> 3. The trial court erred in determining the admissibility of certain evidence in the presence of the jury.
>
> 4. The death penalty received constitutes cruel and unusual punishment violative of the Eighth Amendment rights made applicable to the States by the Fourteenth Amendment of the Federal Constitution.

We will consider these contentions in the order indicated.

### 1.

The first contention of Brice is that the procedure followed by the trial court in the selection of the jury denied him an impartial jury contrary to the Sixth Amendment guarantee applied to the States through the due

process clause of the Fourteenth Amendment to the Federal Constitution. We perceive no such denial of a right to an impartial jury.

The principal thrust of Brice's argument is that the trial court's examination of prospective jurors on *voir dire* resulted in the impaneling of a jury biased in favor of his conviction by the exclusion of prospective jurors who opposed the death penalty, such jurors being as competent to weigh the evidence as those who had no such opposition to the death penalty.

The trial court first posed the following question on *voir dire*:

> "Do any jurors have conscientious or religious scruples against finding a verdict of guilty where the penalty might be death under the law? If you do, would you please stand up."

Fifteen prospective jurors stood up in response to this question.

The trial court then asked the question:
> "Are your conscientious and/or religious scruples against the death penalty such that you could never under any circumstances vote for a verdict of guilty where the penalty of the verdict might possibly be death in the discretion of the Court?"

In regard to Thomas Lovelace, the first person to whom the second question was addressed, the answer was "No." The trial court continued the interrogation, as follows:

> "Q. Then I take it from that statement that while you have conscientious and religious scruples against the death penalty and are opposed to it in principle, that your opposition to it is not such that you would never vote for a verdict of guilty where the penalty might possibly be death regardless of the evidence of the law. In other words, that you would consider

the evidence and weigh it in the light of the alternative punishments provided by the law if you were the juror in this case? A. I mean, I couldn't vote that way.

"Q. Sir? A. I couldn't vote, I mean, to have him put away, you know, killed, if he was found guilty.

"Q. Do I understand you correctly to say that you would never under any circumstances vote for a verdict of guilty regardless of the evidence and regardless of the law if that verdict might possibly result in the death penalty? You would not vote for a verdict of that kind under any circumstances? A. Yes, sir.

"Q. Is that a correct understanding? A. Yes, sir.

"Q. Let me get this clear, Mr. Lovelace. Are you saying that you would never vote for a verdict of guilty where the penalty possibly could be death in the discretion of the Court, regardless of what the evidence was or regardless of what the law states, are you saying that? A. Yes, sir.

"Q. In some of the charges to be tried here a general verdict of guilty under the law would give the Judge the discretion of whether to impose the death penalty or life imprisonment. However, in those cases in that instance, the Jury could prohibit the Judge from imposing the death penalty by adding the words 'without capital punishment.' Are you saying that under no circumstances would you bring in a verdict of guilty giving to the Court the discretion to impose the death penalty? A. No, sir.

"Q. You are not saying that? A. No, sir.

"Q. You are saying it or you are not saying it? A. I ain't saying it."

\* \* \*

"Q. Would you vote for a verdict whereby the

Court might either give him life or death? You would not vote for that kind of a verdict under any circumstances? A. No, sir.

"Q. You would not? A. No. I mean, on the death, I wouldn't on that. I mean, on the other, maybe I would."

The interrogation by the trial court in regard to the same two basic questions, indicates to us that the remaining 14 jurors could possibly have been challenged by the State *for cause*. We are not required to pass upon this question, however, inasmuch as the State used 15 of its peremptory challenges to strike them from the panel. The propriety of this will later be considered in this opinion.

Brice relies upon a statement in *Curtis v. State*, 4 Md. App. 499, 505, 243 A. 2d 656, 660-61 (1968) in which the Court of Special Appeals, in commenting upon Code (1968 Repl. Vol.) Art. 51, § 8A, added to the Code by the Laws of 1967, ch. 500, stated:

"In view of § 8A of Art. 51 we think it the better practice for the court not to put or permit a question to prospective jurors as to their beliefs against capital punishment. But in the circumstances of the instant case we do not think that the mere asking of the question violated the constitutional rights of the appellant. We feel that the court did not abuse its discretion in the asking of the question so as to require reversal. We do not presume prejudice to the appellant therefrom and find none from the record."

In our opinion, reliance upon this statement in *Curtis* is misplaced. The statute referred to in *Curtis* provided:

"Hereafter no person shall be disqualified for service as a juror of this State by reason of his beliefs against capital punishment."

This statute, however, was repealed by the Laws of 1969, ch. 408, § 1; and by this new statute a new § 9 of Art. 51 entitled "Excuses and Exclusions" was passed, subsection (b) of which provides:

> "(b) *Belief against capital punishment.*—No person shall be disqualified, excused, or excluded from service in a particular case as a juror of this State by reason of his beliefs against capital punishment *unless such belief would prevent his returning a verdict of guilt or innocence according to law.*"
> (Emphasis supplied.)

The italicized portion of subsection (b) was the newly added portion of the enactment to former § 8A and obviously added an important modification of the former statutory law.

This statutory change was pointed out by Judge Thompson, speaking for the Court of Special Appeals, in *Kober v. State,* 10 Md. App. 170, 173, 268 A. 2d 593, 595 (1970) and the statement in *Curtis,* relied upon by Brice, was limited to the procedure under the prior law. He stated in note 1:

> "In *Curtis v. State,* 4 Md. App. 499, 243 A. 2d 656, we indicated better practice would preclude such a question in view of Chapt. 500 of Laws of Maryland 1967, codified as Md. Code, Art. 51, § 8A. This statute was repealed by Chapt. 408 of Laws of Maryland 1969, codified as Md. Code, Art. 51, § 9, etc. Section 9 (b) now provides:
>
>> 'No person shall be disqualified, excused, or excluded from service in a particular case as a juror of this State by reason of his beliefs against capital punishment unless such belief would prevent his returning a verdict of guilt or innocence according to law.'

"Thus the question would seem to be proper now if followed by a second question as to whether the belief was strong enough to prevent the rendition of a verdict of guilt or innocence according to law."

The trial court in the instant case followed the proper practice under the *new statute* in strict accord with the practice indicated by the Court of Special Appeals in *Kober*.

Brice also relies on the decision of the Supreme Court of the United States in *Witherspoon v. Illinois,* 391 U. S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968). Again, in our opinion, this reliance is misplaced. The Illinois statute involved provided for the challenge of jurors for cause when jurors expressed religious or conscientious scruples against capital punishment. Mr. Justice Stewart, speaking for a majority of the Supreme Court, stated:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it."

(391 U. S. at 513-14, 88 S. Ct. at 1772-73, 20 L.Ed.2d at 780.)

In note 21 of the majority opinion it is stated:

"Just as veniremen cannot be excluded for

cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. * * * The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. * * *

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment *without regard to any evidence* that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would *prevent them from making an impartial decision as to the defendant's guilt.*" (Emphasis supplied.)
(391 U. S. at 522-23, 88 S. Ct. at 1777, 20 L.Ed.2d at 785.)

Indeed, *Witherspoon* indicates that the questions presented by the trial court were proper and that the State might well have challenged the jurors in question *for cause.*

See also *Crawford v. Bounds,* 395 F. 2d 297, 308, 311 (4th Cir. 1968) substantially to the same effect as the decision in *Witherspoon.*

There appears to be no question of *actual bias* in favor of conviction in the present case and in his brief Brice states that "he may not be able to show that the jury

was bias[ed] with respect to his guilt prior to trial
* * *." After the jury and its alternates were finally
selected, counsel for both the State and Brice indicated
that the entire panel, including the alternates, was ac-
ceptable. The record shows the following:

> "Mr. Thomas [counsel for Brice]: The entire
> panel including the alternates, your Honor, is
> acceptable.
> "Judge Carter: Including both alternates are
> acceptable to the defendant?
> "Mr. Thomas: Yes, your Honor.
> "Judge Carter: As now constituted?
> "Mr. Thomas: As now constituted, your
> Honor."

We are of the opinion that the procedure used by the
trial court in the selection of the jury did not deny Brice
his right to an impartial jury.

### 2.

Secondly, Brice contends that the trial court erred in
allowing the State to use 15 of its 40 peremptory strikes
to eliminate the 15 jurors in question. We perceive no
error.

Both the State and the defendant, Brice, had the right
to exercise their peremptory strikes without cause. Brice
exercised this right 28 times during the selection of the
jury, as he had an undoubted right to do, he having 80
peremptory strikes as we have noted.

Judge Horney, for the Court, stated in *Parker v. State*,
227 Md. 468, 470, 177 A. 2d 426, 427 (1962):

> "Code (1957), Art. 51, § 24 [now Maryland
> Rule 746], provides, among other things, that
> 'the accused shall not challenge more than
> twenty nor the State more than ten jurors,'
> but the statute is silent as to when or in what
> circumstances such challenges may be exer-
> cised. It is obvious, however, as was pointed
> out in *Turpin v. State*, 55 Md. 462 (1881), that

> the privilege of challenging peremptorily is a right to reject a juror without the necessity of first showing cause and not a right to select a juror."

See also *Johnson v. State,* 9 Md. App. 143, 148-51, 262 A. 2d 792, 796-97 (1970) for a comprehensive and helpful review of the Maryland and Federal authorities by Judge Anderson for the Court of Special Appeals, that Court adopting certain language found in the opinion of the Supreme Court of the United States in *Swain v. Alabama,* 380 U. S. 202, 220, 85 S. Ct. 824, 836, 13 L.Ed.2d 759, 772 (1965) in which Mr. Justice White states in part:

> "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control."

In short, the right to exercise the peremptory strike is unfettered and may be exercised by either party for any reason or indeed for no reason. Hunch, passing impression, appearance of the prospective juror, or any other consideration may lead to the exercise of the peremptory challenge and no inquiry may be made in regard to why it is exercised.

When the trial court inquired of counsel for the State in regard to whether the State wished to make "any peremptory challenges to these individuals [the 15 jurors in question] at this time," the State could have declined to use 15 of its peremptory challenges or it could, as it did, exercise them. No one may inquire in regard to the reason the State did this. The use of the 15 peremptory challenges by the State was prior to the time the jury was sworn and this was timely in view of the provisions of Rule 746 c which provides:

> "A peremptory challenge may be exercised as a matter of right until the time that the jury is sworn."

See *Kelley v. State,* 12 Md. App. 251, 262, 278 A. 2d 87, 93 (1971).

Brice contends that, under all the circumstances, the State's challenges were "for cause" and were not in reality peremptory challenges. The plain fact is, however, that the State by exercising 15 peremptory challenges diminished its number of peremptory challenges by that number so that "in reality" they were indeed peremptory challenges.

Even assuming, *arguendo,* that the 15 challenges were "for cause," it appears that such a challenge would have been substantially in accord with *Kober* [10 Md. App. 170, 268 A. 2d 593 (1970)], *Crawford* [395 F. 2d 297 (4th Cir. 1968)] and *Witherspoon* [391 U. S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968)], all *supra,* as we have previously indicated.

We see no error by the trial court in permitting the State to use its 15 peremptory challenges during the course of the *voir dire* examination.

### 3.

Thirdly, Brice contends that the trial court prejudicially erred in determining that evidence of a photograph of the deceased and of a complaint made by the prosecuting witness were *inadmissible* while the jury was in attendance, relying on *Smith v. State,* 189 Md. 596, 606, 56 A. 2d 818, 822 (1948) which cites *Tooisgah v. United States,* 137 F. 2d 713, 716 (10th Cir. 1943) with approval. Judge Grason, for the Court, stated:

> "We are of opinion that the best practice is to hear evidence on the preliminary question [of whether a confession by the accused was freely and voluntarily made] out of the presence of the jury, and we recommend such practice."

The Court then cites *Tooisgah* with approval and quotes from a portion of the opinion in that case, giving the reason for the practice, *i.e.,* that the jury will "not be influenced by knowledge of the circumstances, the sub-

stance, or contents of a confession which is in fact incompetent evidence."

(a) *The Photograph*

Brice objected to the admission into evidence of a photograph of the deceased shortly after his body was discovered. Lt. Rudolph Wilkins had testified in substantial detail in regard to the location of the body and of the physical surroundings in the Franklin Street home. Several photographs had been introduced showing these physical surroundings. When the photograph in question showing the deceased's body partly covered by a bedspread was offered in evidence by the State, in response to a question by the trial court, Lt. Wilkins indicated that the photograph had been taken after he [Lt. Wilkins] had adjusted a bedspread which had previously covered the deceased's head. Lt. Wilkins stated that the photograph showed approximately four inches of the bedspread removed by him from the deceased's head and then put back, after which, said Lt. Wilkins, the bedspread was in substantially the same position as it was before he had removed it. The trial court *sustained* the objection and the jury never saw the photograph in question.

If, in fact, the photograph was a correct representation of the scene as Lt. Wilkins found it—and it rather appeared to be such—the trial court, in its sound discretion, might well have *overruled* Brice's objection and admitted the photograph into evidence. *Sisk v. State,* 232 Md. 155, 157, 192 A. 2d 108, 110 (1963) and *Sisk v. State,* 236 Md. 589, 204 A. 2d 684 (1964); *Corens v. State,* 185 Md. 561, 45 A. 2d 340 (1946); *Culver v. State,* 1 Md. App. 406, 411-12, 230 A. 2d 361, 364-65 (1967). See *Carroll v. State,* 11 Md. App. 412, 414-15, 274 A. 2d 677, 678-79 (1971). The trial court's ruling in *sustaining* the objection may have been more favorable to Brice than he was entitled to and obviously was not prejudicial to him. Then, too, all of the preliminary statements in regard to the photograph merely referred

to facts which were *already before the jury* from other testimony so that there was no prejudice resulting to Brice from that preliminary testimony.

We see no prejudicial error by the trial court in regard to the photograph in question.

### (b)

Brice further objected to the admission into evidence of a three page statement made by Mrs. Richmond, the prosecuting witness, on August 3, 1964, at approximately 3:49 p.m. Here again, the jury already knew that Mrs. Richmond had reported the events of Saturday, August 2, to the police the next afternoon. When counsel for the State wished to introduce Mrs. Richmond's statement, the following occurred:

"(Judge Carter) On what conceivable basis?

"(Mr. Keating) The conceivable basis, your Honor—I have case law to back this up—That the prompt complaint of a rape victim is always admissible into evidence. I have cases on it.

"(Judge Carter) If you want to show that she complained shortly after these events which the State contends took place, that fact is admissible. We understood from your opening statement that this took place a few hours after she had gone somewhere with Brice. The fact that she made the complaint we think is admissible, but a statement that she gave the police headquarters at 4:00 the next afternoon is not part of the res gestae.

"(Mr. Keating) Will you hear me on the law, please, your Honor?

"(Mr. Thomas) *Your Honor, may we approach the bench on this?* (Emphasis supplied)

"(Judge Carter) Just a minute, Mr. Thomas. We are hearing from Mr. Keating at this point.

"(Mr. Keating) There is a special exception

to the hearsay rule, your Honor, involving complaints made promptly by a rape victim. I have two or three Maryland cases which substantiate that point.

"(Mr. Thomas) *Your Honor, may we ask the Jury to be excused during this argument.* (Emphasis supplied.)

"(Judge Carter) Now, what is prejudicial to this as to whether the statement should be or is not admissible? We are not discussing the content of it. It is solely a question of whether the written statement given by the complaining witness at the police headquarters at 4:00 the next day for some alleged criminal activity which purportedly took place some fifteen hours before is admissible."

The jury never saw or heard the contents of the statement and, as we have observed, it was aware that some statement had been made to the police by Mrs. Richmond. Again, there is no prejudice to Brice in regard to the *sustaining* by the trial court of his objection to the admissibility into evidence of the statement by Mrs. Richmond.

The present case does not involve *any alleged confession or inculpatory statement by the defendant, Brice.* In both *Smith v. State,* 189 Md. 596, 56 A. 2d 818 (1948), *supra* and *Tooisgah v. United States,* 137 F. 2d 713 (10th Cir. 1943), *supra,* relied on by Brice, alleged confessions by the accused were involved. This rather clearly distinguishes those cases from the instant case. We find no error in regard to the sustaining of Brice's objection to the admissibility of the statement in the presence of the jury.

### 4.

Finally, Brice contends that the imposition of the death penalty upon him constitutes cruel and unusual punishment prohibited by the Eighth Amendment to the

Federal Constitution imposed upon the States by the due process clause of the Fourteenth Amendment.

In Maryland, cruel and unusual punishment is prohibited by Art. 16 and by Art. 25 of the Declaration of Rights of the Maryland Constitution, which uses substantially the same language as appears in the Eighth Amendment in regard to cruel and unusual punishments.

We reviewed the authorities at some length in regard to this contention in our recent opinion in *Bartholomey v. State,* 260 Md. 504, 273 A. 2d 164 (1971). In *Bartholomey,* we indicated that we were bound by the prior decisions of this Court to hold that the death penalty was not a cruel and unusual punishment prohibited by the Declaration of Rights of the Maryland Constitution. We also partially reviewed the Federal authorities and stated:

> "We note that there are two cases presently pending before the Supreme Court of the United States involving the death penalty, *McGautha v. California* and *Crampton v. Ohio,* 39 U.S,L.W. 3213 (Nos. 203 and 204, October Term, 1970, Argued November 9, 1970), which may possibly resolve the question of the constitutionality of the imposition of the death penalty in the United States but at the present time there is no decision of the Supreme Court of the United States which prevents us from following our prior decisions already mentioned and, as we have indicated, we shall adhere to them."
> (260 Md. at 521, 273 A. 2d at 173.)

We are of the opinion that our decision in *Bartholomey* is applicable to, and dispositive of, the decision in the present case on this point.

*Judgments affirmed.*