WILLIAM LEROY COOK, II *v.* STATE
OF MARYLAND

[No. 671, September Term, 1972.]

*Decided July 11, 1973.*

The cause was argued before ORTH, C. J., and POWERS and SCANLAN, JJ.

*Richard M. Karceski*, with whom were *Harold I. Glaser* and *Sidney Albert* on the brief, for appellant.

*Josef E. Rosenblatt, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City*, and *Paul Cocoros, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

SCANLAN, J., delivered the opinion of the Court.

The appellant, William Leroy Cook, II, following a jury trial before Judge Basil A. Thomas in the Criminal Court of Baltimore, was found guilty of distributing marijuana, maintaining a common nuisance, possession of narcotics paraphernalia and simple possession of methamphetamine and lysergic acid diethylamide (L.S.D.). He received concurrent sentences totaling five years.

This appeal raises the question whether the trial court improperly denied the appellant the twenty (20) peremptory challenges which Rule 746 a 1 assures a defendant who "is subject, on any single count, to a sentence of . . . twenty years or more of imprisonment . . . ." For the reasons stated below, we hold that the court below erred in not affording appellant the twenty (20) peremptory challenges he requested and to which he was entitled by virtue of Rule 746 a 1.[1]

---

1. Accordingly, we do not take up the barrage of additional contentions raised by the appellant in his brief and oral argument before this Court, including his claims that: (1) the court improperly submitted several counts

Count four of Indictment 2344 alleged that the appellant "unlawfully did POSSESS a certain Controlled Dangerous Substance of Schedule II, to wit: Methamphetamine, *which is a Narcotic Drug,* in sufficient quantity to reasonably indicate under all the circumstances an INTENT to Manufacture and Distribute such Controlled Dangerous Substance." (Emphasis added.) Count six of the same indictment alleged that the appellant "unlawfully did POSSESS a certain Controlled Dangerous Substance of Schedule I, to wit: L.S.D. also known as Lysergic Acid Diethylamide, *which is a Narcotic Drug,* in sufficient quantity to reasonably indicate under all the circumstances an INTENT to Manufacture and Distribute such Controlled Dangerous Substance." (Emphasis added.)

Article 27, Section 286 (a) (1) makes it unlawful for any person:

"To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance."

Article 27, Section 286 (b) (1) provides that any person who violates Section 286 (a) with respect to a "substance classified in Schedules I or II *which is a narcotic drug* shall, upon conviction, be deemed guilty of a felony, and sentenced to a term of imprisonment for not more than *twenty (20) years* . . . ." (Emphasis added.) On the other hand, the penalty provided where the violation is with respect to "any other controlled dangerous substance classified in Schedules I, II,

---

of the two indictments to the jury for their determination; (2) the trial court abused its discretion in permitting two of the witnesses to qualify and testify as experts; (3) the State failed to prove the necessary chain of custody over items seized from the appellant at the time of his arrest; and (4) the evidence was insufficient to support the appellant's conviction of the crime of possession of marijuana in sufficient quantity to reasonably indicate an intent to manufacture or distribute. However, we have considered and agree with appellant's contention that the evidence was insufficient to sustain his conviction under Indictment 2345 (maintaining a nuisance house). The State also concedes the point. We, therefore, reverse the judgment under Indictment 2345.

III, IV or V . . ." is imprisonment for a term of not more than five (5) years. Section 286 (b) (2).

Article 27, Section 277 (q) sets forth an abstruse definition of "narcotic drug." Specifically, it provides that:

" 'Narcotic drug' shall mean any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis; and which have been found to present an extreme danger to the health and welfare of the community because of their addiction-forming and addictive-sustaining liabilities:

(i) " 'Opiate' which shall mean any dangerous substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability; and the 'opium poppy' which shall mean the plant of the species Papaver somniferum L., except the seeds thereof and the 'poppy straw' which shall mean all parts, except the seeds, of the opium poppy, after mowing; and coca leaves which shall mean cocaine and any compound, manufacture, salt, derivative, mixture or preparation of coca leaves, except derivatives of coca leaves which do not contain cocaine, ecgonine or substances from which cocaine or ecgonine may be synthesized or made;

(ii) "A compound, manufacture, salt, derivative, or preparation of opium, coca leaves, or opiates;

(iii) "A substance and any compound, manufacture, salt, derivative, or preparation thereof which is chemically identical with any of the substances referred to in clauses (1) [(i)] and (2) [(ii)], except that the words 'narcotic drug' as used in this [section] include decocainized coca leaves or

extracts of coca leaves, which extracts do not contain cocaine or ecgonine."

The appellant's position on the issue which confronts us is simple and, on the facts of this case, persuasive. He argues that counts four and six of Indictment 2344 specifically charged him with possession of, with intent to distribute, "methamphetamine and lysergic acid diethylamide, 'narcotic drugs, in sufficient quantity to reasonably indicate under all the circumstances an intent to manufacture and distribute such controlled dangerous substance.' " The record indicates that the appellant made a timely request of the trial judge that he be allowed twenty (20) peremptory challenges by virtue of Rule 746 a 1. This request was denied with the trial judge limiting him to four (4) peremptory challenges. The record is silent concerning the reasons which prompted the court's ruling. At no time, either prior to or during the trial, was Indictment 2344 amended to specify that methamphetamine and L.S.D. were "non-narcotic," in contrast to their identification as "narcotic drugs" in the indictment. The record shows that no evidence was introduced of the non-narcotic nature of the two drugs in question until testimony to that effect was given by one of the State's expert witnesses during the trial.

The State, on the other hand, contends that neither methamphetamine nor L.S.D. are in fact narcotic drugs, and that the term "narcotic drug," as used in counts four and six of Indictment 2344, is surplusage, since the indictment identified the two drugs and the Schedules in which they are listed. From this the State moves to the conclusion that the appellant could reasonably have determined that methamphetamine and L.S.D. are non-narcotic drugs, and, *ergo*, appellant was not entitled to the twenty (20) peremptory challenges which he sought at the outset of the trial.

The assumptions on which the State's argument rests do not withstand close scrutiny. We start with the unquestioned proposition that the peremptory challenges to which an accused is entitled by virtue of Rule 746 a 1

represents an important right "vital to the conduct of a criminal cause in this State." *Johnson v. State*, 9 Md. App. 143, 149, 262 A. 2d 792, 796 (1970). Thus, if any count of Indictment 2344 charged an offense which would subject the appellant, if found guilty, to a sentence of twenty (20) years or more of imprisonment, he had an "unfettered" right to twenty (20) peremptory challenges, *Brice v. State*, 264 Md. 352, 366, 286 A. 2d 132, 134 (1972), and the court below erred in limiting him to only four such challenges.

As stated, the State concedes that the fourth and sixth counts of Indictment 2344 identified methamphetamine and lysergic acid, respectively, as a "narcotic drug." This designation, it argues, however, was "surplusage." Examination of the fourth and sixth counts show that both were typed on a printed form. One space on that form is left blank, to be filled in with the name of the drug with which an accused is charged with possession with intent to manufacture, etc. Immediately following this space there is language reading in part "which is/is not a narcotic drug." In both the fourth and sixth counts of Indictment 2344 the phrase "is not" has been stricken out by three x-marks. Yet, if the term "narcotic drug" as used in counts four and six of the indictment was merely surplusage, as the State contends, it is difficult to understand why the phrase "is not" was deliberately stricken from the indictment form.

Similarly, we are not impressed by the State's contention that the appellant should have known the non-narcotic nature of the two drugs of which he was accused of having in his possession with intent to manufacture and distribute because each was specifically designated by name in the indictment and, additionally, the Schedule in which each was listed also set forth therein. Turning to Schedule I and II, as found in Article 27, Section 279, we find methamphetamine is listed in Schedule II (Sec. 279 (b)4c) and lysergic acid diethylamide is listed in Schedule I (Sec. 279 c 6). The listing of these two drugs in the respective Schedules, however, establishes only that they "are controlled dangerous substances." Their listing in the Schedules *per se* provides no clue to whether or not they are narcotic drugs.

It is true that the controlled dangerous substances listed on Schedule I, including L.S.D., are substances which have been found to have a "high potential for abuse," "no accepted medical use in the United States," and a "lack of accepted safety for use under medical supervision." Section 279 (a) (1), (2) and (3). The drugs listed in Schedule II, including methamphetamine, have been found to have a "high potential for abuse," "are currently accepted for medical use in the United States" and their abuse "may lead to severe psychic or physical dependence." 279 (b) 1, 2 and 3. The mere listing of a substance in Schedule I or II, however, does not inform the reader, including a criminal defendant or his counsel, as to whether or not the particular substance is a narcotic or a non-narcotic drug.

As we have indicated, "narcotic drug" is defined in Article 27, Section 277 (q) (i), (ii) and (iii). The first paragraph of Section (q) reads:

> " 'Narcotic drug' shall mean any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis; and which have been found to present an extreme danger to the health and welfare of the community because of their addiction-forming and addictive-sustaining liabilities."

There then follow in subparagraphs (i), (ii) and (iii) of paragraph (q) quoted, the several categories of narcotic drugs, including an "opiate." The latter is defined to include "any dangerous substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability . . . ."

In the light of the potentially broad reach of the statutory definition of "narcotic drug," the State's argument that the appellant could reasonably have determined, by reading the indictment and then referring to the statute, that methamphetamine and lysergic acid diethylamide are non-narcotic drugs lacks merit. The appellant is not a

chemist. When the State charged appellant with possession of a drug identified in the indictment as a "narcotic drug," he was entitled to take the State at its word at least until evidence to the contrary was produced. Such evidence was not introduced until halfway through the trial when, through the testimony of one of its experts, the State disclosed the non-narcotic nature of both methamphetamine and L.S.D. That disclosure, however, cannot be applied retroactively. The number of peremptory challenges to which the appellant was entitled must be determined on the face of the counts of the indictment and the right to exercise those challenges arises *prior* to the jury being sworn. Rule 746 c; and *see Brice v. State, supra* at 366. The appellant was neither a chemistry major nor gifted with clairvoyance. He could not reasonably have known before the jury was sworn, or have anticipated at that time, that testimony later would demonstrate that the two drugs allegedly in his possession were non-narcotic drugs. Accordingly, he was entitled to the twenty peremptory challenges guaranteed by Rule 746 a 1, since both counts four and six charged him with a crime for which, if convicted, he might receive a prison sentence of twenty years.

In considering the issues presented by this appeal, the Court has encountered what may be two gaps, one perhaps intentional, the other more likely an oversight, in the Controlled Dangerous Substances Act of 1970. Although not necessary for the disposition of the present appeal, discussion of these apparent lacunae in the statute may be helpful to the Department of Mental Health and Hygiene, the trial courts of the State and defendants in future criminal proceedings arising under the prolix provisions of the narcotics laws.

First, we refer to the definition of "narcotic drug," as set out in Section 277 (q), especially the phrase reading *"and which have been found to present an extreme danger to the health and welfare of the community because of their addiction-forming and addictive-sustaining liabilities."* (Emphasis added.) It might be argued that before a drug may be classified as a "narcotic drug," within the definition

of Section 277 (q), there must be a prior administrative finding by the Department of Health and Mental Hygiene that such a drug presents "an extreme danger to the health and welfare to the community because of ... [its] addiction-forming and addictive-sustaining liabilities." Under that interpretation of the statute, even drugs which fall within the category set forth in subparagraphs (i), (ii) and (iii), Section 277 (q) would still not be covered by the statutory definition of narcotic drugs until the Department had made such a finding.

In our opinion, however, the statute is not to be interpreted so as to require further administrative findings before a drug falling within the categories expressly enumerated in subparagraphs (i), (ii) and (iii) of Section (q) may qualify as a "narcotic drug." The previous statute, Article 27, Section 276 (o) of the Maryland Code (1957), provided that:

> "The term 'narcotic drugs' also shall be taken to include any drug or substance similar to those listed hereinabove, whether synthetic or otherwise and whether or not physically distinguishable from those listed hereinabove, and whatever may be its trade name, found by the State Board of Health, after reasonable notice and opportunity for hearing, to have comparable habit-forming qualities and effects of habituation, from the effective date of determination of such finding by said State Board of Health."

Article 27, Section 277 (q), however, does not prescribe any procedure pursuant to which the Department of Health and Mental Hygiene may add other substances to the statutorily defined categories of "narcotic drugs" following a finding by the Department that they present an extreme danger to the community because of their addiction-forming and addictive-sustaining liabilities. In contrast, Article 27, Section 278 (a) does provide a procedure, including notice and hearing, pursuant to which the Department may add a substance to the controlled dangerous substances listed in Schedules I through V, as set out in Article 27, Section 279.

When the General Assembly enacted the Controlled Dangerous Substances Act in 1970, it failed to provide any procedures by which the Department might find and determine that additional substances should be included within the statutory definition of "narcotic drugs" in Section 277 (q), although it did provide for such procedures in permitting the Department to add to the lists of "controlled dangerous substances" contained in Schedules I through V.

We conclude, therefore, that the language of the last clause of the first paragraph of Section 277 (q), which reads in part "and which have been found," etc., is a *legislative finding* by the General Assembly that the categories of narcotic drugs thereafter listed in subparagraphs (i), (ii) and (iii) of paragraph (q) have addiction-forming and addictive-sustaining liabilities and present an extreme danger to the health and welfare of the community. It follows that the statutory classifications of "narcotic drugs" found in Section 277 (q) may only be supplemented by specific amendment to the statute, since no procedure has been set up to accomplish such a result through an administrative determination initiated by the Department of Mental Health and Hygiene.

The omission from the 1970 act of any provision allowing the categories of "narcotic drugs" to be expanded by administrative action appears to us to have been intentional. In view of the significantly more severe penalties imposed on violators of the statute when "narcotic drugs" are involved, the General Assembly may have deliberately chosen to require that any supplementing of the categories of narcotic drugs now included in the statute be achieved through legislative rather than merely administrative action. We note in this connection that the federal statute regulating the distribution and possession of controlled substances, which contains a definition of "narcotic drugs" which is simpler than, but not dissimilar to, the definition set out in the Maryland statute [2] also does not provide for

---

2. "The term 'narcotic drug' means any of the following, whether

procedures which would permit additions to the categories of "narcotic drugs" solely through administrative action.

We turn now to a second hiatus in the Controlled Dangerous Substances Act, and one which appears to be an inadvertent, rather than an intentional, legislative omission.

In Schedule I of the federal act, 21 U.S.C. 812 (c), the statute lists by name 42 substances which it identifies as "opiates." Since the definition of "narcotic drugs" found in 21 U.S.C. 802 (16) expressly includes "opiates" in subparagraph (B) thereof, a person charged with possession with the intent to distribute any one of the 42 drugs listed in Schedule I would be on notice that he was charged with possession of a narcotic drug and thus subject to a more severe penalty than in the case of non-narcotic drugs, as prescribed in 21 U.S.C. 841 (b) (1). Schedule I of the Maryland statute, as found in Article 279 (a) lists the same 42 opiates found in the federal act. Unlike the federal statute (21 U.S.C. 812 (c)), however, Schedule I of our statute fails to identify the 42 drugs listed in Schedule I as "opiates." Instead, in the Maryland statute the list of these 42 drugs is immediately preceded by the following language:

> "*Any of the following substances*, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, unless specifically excepted, whenever the existence of such isomers, esters, ethers and salts is possible within the specific chemical designation." (Emphasis added.)

---

produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

"(A) Opium, coca leaves, and opiates.

"(B) A compound, manufacture, salt, derivative, or preparation of opium, coca leaves, or opiates.

"(C) A substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clause (A) or (B). Such term does not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine."

The above stated variance between Schedule I of the Maryland statute and the corresponding Schedule of the federal act is difficult to explain. The Court is inclined to believe that the difference may be the result of an inadvertence in legislative drafting and not of deliberate legislative choice. Accordingly, the General Assembly may wish to consider an amendment to Article 279 (a), Schedule I (a) to change the phrase "any of the following substances" to read "any of the following opiates." If such a change were made, it would be unnecessary, unless challenged by the defense, to introduce expert testimony as to the narcotic nature of any of the 42 drugs now listed in Schedule I, since their classification as an "opiate" would incorporate by reference the definition of "narcotic drug," which includes "opiates," found in Article 277, Section (q) (1). Moreover, the Department also could add to the list of opiates found in Schedule I by following the procedures prescribed in Article 27, Section 278 (a).

Our conclusion that the omission of the word "opiate" from Schedule I, subparagraph a was inadvertent is further confirmed when we look at subparagraph b of the same Schedule. Under that subparagraph, 28 substances, substantially identical to the drugs listed in subparagraph (b) of Schedule I of the federal statute, are set forth following their identification in the Schedule as "opium derivatives." Thus, a person charged with the possession of any of the 28 "opium derivatives" listed in subparagraph b of Schedule I of the Maryland statute should know that he was charged with the possession of a "narcotic drug" as defined in Section 277 (q) (ii), since the statutory definition specifically includes any "derivative . . . of opium."

We hope that our discussion of the provisions of the Controlled Dangerous Substances Act, including Schedule I, even though not directly required for a decision in this case, possibly may serve for a clearer understanding of the statute as it may be applicable in future proceedings. Obviously, the statute is not a model of clarity. Confusion, or misunderstandings, concerning a criminal statute should be avoided, or at least reduced to a minimum, when that is

possible without subverting legislative intention. Our opinion is an effort in that direction.

> *Judgment under counts 1, 2, 3, 5 and 7 of indictment 2344 reversed and the case remanded for new trial on those counts; judgment under the first count of indictment 2345 reversed; costs to be paid by the Mayor and City Council of Baltimore.*